# THE PEOPLE OF THE STATE OF ·CALIFORNIA, *ex rel.* THE ATTORNEY GENERAL *v.* R. R. PRO-VINES.

THE POLICE COURT AND OFFICE OF POLICE JUDGE OF THE CITY AND COUNTY OF SAN FRANCISCO.—The Police Court and office of Police Judge of the City and County of San Francisco, as they then existed, were not abolished by the ratification, in 1862, of the amendments to the Sixth Article of the Constitution.

IDEM—UNDER WHAT AUTHORITY CREATED.—Said Court and office were created by the Legislature under the authority conferred by the first section of the Sixth Article and the thirty-seventh section of the Fourth Article of the Constitution, as they existed prior to the ratification of the Constitutional amendments in 1862. The latter section, which alone furnished ample authority for the purpose, was unchanged by the amendments, while the former section, so far as pertinent to the power of the Legislature over the subject of municipal and other inferior Courts, underwent no change except of a verbal character, which in no respect altered the sense or meaning of the Constitution.

OBJECT OF THE CONSTITUTION.—The Constitution was formed for the purpose of establishing a State government, which is to be distinguished from local, county and municipal governments. The Constitution does not, of itself, *ex proprio vigore*, create or establish any local, county or municipal governments, but provides that they shall be created and established by the Legislature, and there drops the subject.

INTERPRETATION OF ARTICLE III OF THE CONSTITUTION.—The Third Article of the Constitution means that the powers of the *State* government—not the local governments thereafter to be created by the Legislature—shall be divided into three departments, and that the members of one department shall have no part or lot in the management of the affairs of either of the other departments, "except in the cases hereinafter expressly directed or permitted."

IDEM.—The departments of which it speaks and in respect to which it provides that no person employed in one shall be employed in either of the other two, are the departments of the State government, as expressly defined and limited in the Constitution, and means that no member of the Legislative Department, as defined in the Constitution, shall at the same time be a member of the Executive or Judicial Department, as therein defined, and *visa versa*. *Burgoyne* v. *Board of Supervisors of San Francisco*, 5 Cal. 191, and the series of cases down to and including *Sanderson's Case*, 30 Cal. 160, so far as they assert a different rule of interpretation, are overruled.

IDEM.—There is nothing in the Third Article of the Constitution which prohibits the Police Judge of the City and County of San Francisco from holding and performing the duties of the office of Police Commissioner of said city and county, as an *ex officio* office.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

This was an action brought by the Attorney General, in

the name of the People, against the defendant, the Police Judge of the City and County of San Francisco, for unlawfully intruding into the office of Police Commissioner of said city and county. The complaint recites the due election—at the general election in 1867—and qualification of defendant to the said office of Police Judge, which is alleged to be a judicial office; that under an Act of the Legislature passed April 19th, 1856, which Act is alleged to be unconstitutional and void, defendant unlawfully intrudes into said office of Police Commissioner.

The answer takes issue with all the averments of the complaint, except the holding of said office of Police Commissioner by defendant, which holding is alleged to be lawful. The defendant had judgment in the Court below, and the People appealed. The case is presented on appeal upon an agreed statement of facts.

The other facts necessary to understand the points decided on appeal, are stated in the opinion of the Court.

*Frank M. Pixley*, for Appellant.

*Quint & Hardy*, for Respondent.

[All the authorities cited and points made in the briefs for appellant and respondent are cited and discussed in the following opinions.—REP.]

By the Court, SANDERSON, J.:

The principal points made by the appellant are two:

First—That by the amendments to the Sixth Article of the Constitution, adopted and ratified in 1862, the Police Court and the office of Police Judge in the City and County of San Francisco, as they had before that time existed, were abolished; and hence, there having been no legislation since that time by which a Police Court has been expressly created,

66

the respondent is not vested *de jure* with the office of Police Judge, and cannot, therefore, act *ex officio* as Police Commissioner.

Second—That assuming the foregoing point to be untenable, and that the Police Court exists *de jure*, and that the deponent is *de jure* the Judge of that Court, the functions of Police Commissioner are such as properly belong to the Executive Department of the Government, and cannot, therefore, under the Third Article of the Constitution, be exercised by an officer who is also charged with the exercise of powers which appertain to the Judicial Department.

*First*—The first point admits of two answers—one founded upon a technicality, the other upon the merits of the question.

*a.* The official capacity of the respondent, as Police Judge, cannot be investigated or determined in this proceeding. It is not alleged in the complaint that the respondent has usurped and unlawfully holds and exercises the office of Police Judge, nor is the determination of his right to that office demanded. The alleged usurpation is charged against him in relation to the office of Police Commissioner only. The case made not only assumes but directly alleges the legal existence of the Police Court, and the lawful possession of the office of Police Judge by the respondent. Instead of the legal existence of the Police Court, or office of Police Judge, and the lawful exercise of that office by the respondent, being made a question by the Attorney General, it is expressly alleged in the complaint that, at the last general election prior to December, 1867, the respondent " was duly elected, commissioned and qualified as Judge of the Police Judge's Court in and for the City and County of San Francisco, and that, on or about the 2d of January, 1868, he entered upon and has ever since been exercising the duties of his said judicial position." In its connection, the word " duly " must be understood as the equivalent of the word " legally." So the allegation, as well as the whole tenor of the complaint, must be considered as directly affirming the

legal existence of the office, and the legal incumbency of the respondent.

In short, the whole argument of the complaint proceeds upon the theory that the Police Court is a legal tribunal, and the respondent the lawful incumbent of the office of Police Judge, and for that reason only he cannot lawfully exercise the office of Police Commissioner.

It being well settled that the title to an office cannot be tried collaterally (*People* v. *Sassovich*, 29 Cal. 485,) it therefore follows that for all the purposes of the present case it must be assumed that the Police Judge's Court has been legally established, and that the respondent holds the office of Police Judge by a legal tenure.

*b.* But, independent of the foregoing consideration, we are of opinion that the Police Judge's Court is a lawful tribunal. It was created prior to the adoption of the constitutional amendments of 1862, by Act of the Legislature, working under the power conferred upon it by the last clause of the first section of the Sixth Article of the Constitution, as it read prior to 1862, as well as that conferred by the thirty-seventh section of the Fourth Article in relation to the organization of cities and incorporated villages, which, independent of all other provisions—especially in the absence of an express prohibition—must be understood as including the power to create municipal Courts, as a necessary element in the organization of city governments. It is not pretended that any change was intended, or, in fact, made in relation to the latter section by the amendments of 1862, and if—as we think is the case—the power to create municipal Courts must be considered as included in the power to create municipal governments, it follows that such Courts then existing were no more affected by the amendments of 1862 than the other departments in which the powers of such governments were vested, and that the municipal corporation known as the City and County of San Francisco existed after the amendments of 1862 precisely as it existed before, with all its powers and departments unimpaired.

But in addition to this view, which would seem to be conclusive of the question, if we assume that the whole subject of Courts falls within the purview of the Sixth Article of the Constitution, the result is the same; for, as to the power of the Legislature over the subject of municipal and other inferior Courts, the amendments made no change except of a merely verbal character, which in no respect altered the sense or meaning of the Constitution. This is made apparent by simply comparing the first section of Article VI, as it now reads, with the same section prior to the amendments. Before the amendments it read as follows: "The judicial power of the State shall be vested in a Supreme Court, in District Courts, in County Courts, and in Justices of the Peace. The Legislature may also establish such municipal and other inferior Courts as may be deemed necessary." In the amendments the following language is employed: " The judicial power of this State shall be vested in a Supreme Court, in District Courts, in County Courts, in Probate Courts, and in Justices of the Peace, and in such Recorders' and other inferior Courts as the Legislature may establish in any incorporated city or town." It is clear, on inspection, that while, as already suggested, verbal changes were made, no change was made in the sense or meaning, so far as the power of the Legislature over the subject of municipal Courts is concerned. They remained thereafter, as before, the creatures of the Legislature, to be abolished or created at the pleasure of that body. No change in that respect was made or attempted, and hence the legislation on that subject previously had, and then existing, was no more repugnant to the Constitution after its amendment than before, and, if valid before, by parity of reasoning, valid afterwards.

There is nothing in the case of *Olivarez*, 21 Cal. 415, which runs counter to this view. In that case the effect of the amendments upon Courts created by the Constitution itself, was under consideration. To the reorganization of those Courts the amendments were specially addressed, and

it was very properly held that their effect was to abolish those which had previously existed and establish new ones in their stead. Upon this branch of the case, in either aspect in which we have considered it, our conclusion is in favor of the proposition that the Police Judge's Court is a legal tribunal, and that the respondent holds the office of Police Judge by a legal tenure.

*Second*—The second point made by counsel for the appellant involves the construction of the Third Article of the Constitution. It is in the following words : "The powers of the Government of the State of California shall be divided into three separate departments—the Legislative, the Executive and Judicial—and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except in the cases hereinafter expressly directed or permitted."

This provision of the Constitution has come before this Court in a number of cases, in which, as is claimed by the learned counsel for the appellants, it has received a construction which is conclusive in favor of his second point.

We propose to briefly notice those cases in the order of their coming, for the double purpose of ascertaining precisely what has been decided in relation to the present question, and of stating our conclusions in relation to the soundness of each case, in order that there may be, hereafter, no doubt as to which are to be regarded as law, and which not.

The first case is that of *Burgoyne* v. *The Board of Supervisors of the County of San Francisco*, 5 Cal. 19. Under a statute which existed at that time, the Court of Sessions was vested with certain powers—in the matter of county government—which have been since, and by reason of that case, vested in the Board of Supervisors, in their nature of a mixed character, being partly legislative, executive and judicial. The action was brought to recover the amount due on certain warrants drawn by the County Auditor on the Treasurer of the county, which warrants had been

issued by order of the Court of Sessions, to pay for a lot which had been purchased by its order made in the exercise of its executive functions. The point was made that the purchase and the warrants were void, for the reason that the Court, being a part of the Judicial Department of the State Government, was prohibited from exercising executive functions by the Third Article of the Constitution. The Court ruled the point well taken.

The next case is that of *Exline* v. *Smith*, 5 Cal. 112. The Civil Practice Act then contained a provision in relation to the waiver of jury trials, which closed with the words : " The Court may prescribe by rule what shall be deemed a waiver in other cases." In pursuance of this provision, the County Court of El Dorado County provided that a jury should be deemed waived in certain other cases than those specified by the statute. The case in question fell within the rule, and the Court refused a jury, although demanded by one of the parties. It was claimed on appeal that the statute authorizing the Court to make rules upon the subject of waiver of jury trials was repugnant to the third section of the First Article of the Constitution, which deals with the right of trial by jury, and, among other things, provides that " a jury trial may be waived by the parties in all civil cases in the manner to be prescribed by law ;" and also to the Third Article of the Constitution, because it conferred legislative functions upon the Court. The ruling of the Court below was reversed upon both grounds.

The next is that of *Dickey* v. *Hurlburt*, 5 Cal. 343, which involved the power of a County Judge to designate the place and manner of holding elections under the provisions of the Act of 1850 in relation to the permanent location of seats of justice. It was held that the designation of the place and manner of holding elections was a ministerial act, and could not, therefore, under the Third Article of·the Constitution, be conferred upon a judicial officer.

The next is *Thompson* v. *Williams*, 6 Cal. 88, which involved the constitutionality of the provision in the Practice Act

which vests the County Judges with power to issue writs of injunction. It was held, among other things, that the issuing of injunctions was a judicial act, and could, therefore, be performed by a County Judge without violating the rule in *Burgoyne's Case.*

The next is *Tuolumne County* v. *Stanislaus County,* 6 Cal. 440. It involved the constitutionality of a statute by which the County Judges of those counties were required to appoint Commissioners to ascertain and settle certain matters of indebtedness between the counties, it being claimed that the act of appointment was executive in its nature, and could not, therefore, under the rule in *Burgoyne's Case,* be exercised by a judicial officer. The Court adhered to the rule in *Burgoyne's Case,* but held further that the act of appointment in that case was of the same functional character as the appointment of arbitrators and referees, and therefore judicial.

The next is the case of *Phelan* v. *San Francisco,* 6 Cal. 531, which, so far as the present question is concerned, was founded upon facts in all legal respects like those in *Burgoyne's Case,* and the rule in that case was re-affirmed—Mr. Justice Terry dissenting.

The next is that of *The People* v. *Hester,* 6 Cal. 679. It was an application to this Court for a mandamus to compel the District Judge of the Third District to issue a certiorari to review the proceedings of the Board of Supervisors of Alameda County in assessing a certain tax alleged to be illegal. It was held that the Board of Supervisors did not exercise judicial functions, and that therefore a writ of certiorari could not be directed to them. While it was not so stated, the very erroneous conclusion that a Board of Supervisors does not exercise judicial functions, was due to the rule in *Burgoyne's Case,* for it was so stated in the subsequent case of *The People* v. *El Dorado County,* in which *Hester's Case* was expressly overruled.

The next is the case of *The People* v. *El Dorado County,* 8 Cal. 58. It was an application to the District Court of the

Eleventh District for a certiorari to review the action of the
Board of Supervisors in allowing a certain claim against the
county, alleged to be illegal. The District Court denied
the writ upon the authority of *The People* v. *Hester.* On
appeal, this Court said: "The decision in *The People* v.
*Hester* proceeded upon the grounds that the Third Article of
the Constitution of this State had so distributed the powers of
government as to forbid those charged with duties belonging
to one from exercising functions appertaining to another
department. That by law a writ of certiorari could only
issue to an inferior Board or officer exercising judicial func-
tions, and that it was inconsistent with the theory of the dis-
tribution of powers by the Third Article for the Supervisors
to exercise judicial powers. *   *   * The error in the case
of *The People* v. *Hester* consisted in overlooking the fifth
section of the Eleventh Article of the Constitution, which
provides that ' the Legislature shall have power to provide
for the election of a Board of Supervisors in each county,
and these Supervisors shall jointly and individually perform
such duties as may be prescribed by law.' This section
must be regarded as a limitation on the Third Article. In
using the word ' Supervisors,' the Constitution intended to
adopt it with its known meaning, and in the sense in which
it was generally understood.

"The word ' Supervisors,' when applied to county officers,
has a legal signification. The duties of the officers are
various and manifold—sometimes judicial, and at others
legislative and executive. From the necessity of the case it
would be impossible to reconcile them to any particular
head; and, therefore, in matters relating to the police and
fiscal regulations of counties, they are allowed to perform
such duties as may be enjoined upon them by law, without
any nice examination into the exact character of the powers
conferred."

So the rule in *Burgoyne's Case* was modified so as not to
include Boards of Supervisors.

The next case is that of *The People* v. *Bircham,* 12 Cal. 50.

The power of the Court of Sessions to release Bircham and his sureties from liability upon a forfeited recognizance under a special statute conferring upon it the power to do so, in view of the rule in *Burgoyne's Case,* was incidentally involved, and some doubt was cast upon the authority of that case by the following language employed by Mr. Justice Baldwin in delivering the opinion of the Court: "Whether the Court of Sessions could constitutionally exercise the power of making this release, it is not necessary to inquire, though, if it chose to act in the matter, it is not easy to see why its discharge of a mere ministerial function of this sort would not be valid."

The next case is that of *Uridias* v. *Morrill,* 22 Cal. 473. The question was whether the same person, in view of the Third Article of the Constitution, could hold the office of Mayor and Justice of the Peace, as provided in the charter of the City of San José. It was held that the case fell under the last clause of the first section of the Sixth Article, which provided that the Legislature may establish municipal and other inferior Courts. That the term "municipal Courts," *ex vi termini* imported Mayor's and Recorder's Courts, which, in turn, implied a Court to be presided over by the Mayor of the city, and that therefore the case was one of those directly referred to in the exception to the Third Article of the Constitution, permitting the same person to exercise mixed functions in cases thereafter expressly directed or permitted.

The next and last is *Sanderson's Case,* 30 Cal. 160. Sanderson held the office of Chief Justice of this Court, and was also performing the duties of a Trustee of the State Library, under the provisions of a statute then in force. The action was of the same character as the present, and was brought for the purpose of judicially ascertaining whether Sanderson, being a member of the Judicial Department of the State Government, could constitutionally hold the office of Trustee in view of the Third Article of the

67

Constitution. Following the rule in *Burgoyne's Case*, it was held that the office of Trustee pertained to the Executive Department of the State Government, and could not, therefore, be held by a member of the Judicial Department.

The foregoing are all the cases bearing upon the question in hand, so far as we are advised. If there are other cases, they have not been called to our attention, and have escaped our notice. From them we deduce the following general rule, as embodying the law of the present case as it now stands : The Third Article of the Constitution prohibits all persons charged with the exercise of functions which are in their nature of either a legislative, executive or judicial character, from exercising the functions of either of the other two classes, except " Boards of Supervisors " and " municipal Courts."

Doubtless we might leave this condition of the law undisturbed, so far as the mere disposition of the present case is concerned, for it would seem to fall within the reason of the rule in *Uridias* v. *Morrill;* but the principle involved is one of great importance and of frequent application, and should not be allowed to stand upon a foundation which, after a careful examination, appears to us to be altogether uncertain and unsatisfactory. The rule as above stated is not, in our judgment, in accordance with the letter or spirit of the Constitution, and the public interests require at our hands a statement of what we understand to be the true intent and meaning of the Third Article of the Constitution. To that end, we deem it advisable, at the threshold of our argument on this point, to declare our conclusions as to the soundness of the several cases to which we have referred, leaving our reasons to appear from what we have to say when we come to interpret for ourselves, independent of those cases, the Third Article of the Constitution, as we understand it.

*Burgoyne's Case* was decided, in our judgment, upon a misconception of the true meaning and scope of the Third Article of the Constitution, and there was at that time, as we consider, no constitutional objection to the exercise by

the Court of Sessions of the powers which it had exercised in that case.

The same is true of *Exline* v. *Smith* and *Dickey* v. *Hurlburt*, except so far as the former turns upon the construction of the third section of the First Article of the Constitution, as to which we express no opinion, for the reason that the construction of that provision is not involved in the present inquiry.

To the decision in *Thompson* v. *Williams* we take no exception, except so far as it confirms the rule in *Burgoyne's Case*.

The decision in *Tuolumne County* v. *Stanislaus County* was right, but we dissent from the grounds upon which it was put. The act of appointing Commissioners in that case was not analagous to the appointment of arbitrators or referees, in our judgment, and was not the exercise of a judicial function, and was not, therefore, under the rule in *Burgoyne's Case*, constitutionally conferred upon judicial officers.

The decision in *Phelan* v. *San Francisco*, so far as it involved the question in hand, stands upon a level with *Burgoyne's Case*.

*The People* v. *Hester* was properly overruled in *The People* v. *El Dorado County*, which latter case is erroneous only so far as it implies that Boards of Supervisors are rescued from the operation of the rule in *Burgoyne's Case* only by force of the fifth section of the Eleventh Article of the Constitution, which provides that the Legislature shall have power to provide for the election of a Board of Supervisors in each county. While we agree to what was said as to the meaning of the latter section, we dissent from the doctrine that in the absence of that section the Legislature could not, by reason of the Third Article, confer mixed functions upon Boards of Supervisors.

The judgment in *Uridias* v. *Morrill* is consistent with our views, but in the grounds upon which it was put the same error was committed which we have noticed in the case of *The People* v. *El Dorado County*. In our judgment there is nothing in the general rule declared in the Third Article

which made it necessary to resort to the expediency of holding that the last clause of the first section of Article VI presents one of the cases referred to in the exception of the Third Article—a proposition manifestly untenable, for the first section of the Sixth Article does not confer upon the Legislature other than legislative functions, and hence the power there conferred obviously cannot be within the exception to the Third Article.

The decision in *Sanderson's Case* was founded upon the rule in *Burgoyne's Case*, and is, therefore, equally erroneous. As we now understand the question, there is no constitutional reason why the Chief Justice of this Court cannot also hold the office of Trustee of the State Library and exercise its functions—the latter office not pertaining, as will appear hereafter, to either the Legislative or Executive Departments, in the sense of the Third Article of the Constitution.

Our only remaining duty in connection with this case is to declare what we consider to be the true meaning and scope of the Third Article of the Constitution.

We understand the Constitution to have been formed for the purpose of establishing a *State* Government; and we here use the term "State Government" in contradistinction to local, or to county and municipal governments. But by this we do not intend to be understood to say that local governments are not within the general plan of the Constitution, for such governments are necessary incidents to all forms of government—using that term in its most enlarged and popular sense—in use among civilized nations. What we mean to be understood as saying, is that the Constitution does not, of itself—*ex proprio vigore*—create or establish any local or municipal governments; but, assuming that such governments will be required, provides that they shall be created and established by the Legislature, and there drops the subject. "The Legislature shall establish a system of county and town governments, which shall be as nearly uniform as practicable throughout the State." (Sec. 4, Art. XI.) "It shall be the duty of the Legislature to provide for the organ-

ization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such municipal corporations." (Sec. 37, Art. IV.) "Each county, town, city and incorporated village shall make provision for the support of its own officers, subject to such restrictions and regulations as the Legislature may prescribe." (Sec. 9, Art. XI.) These provisions show very clearly that the creation and regulation of local and subordinate governments, such as county, city and town governments, is not attempted in the Constitution; and that the whole subject of local and subordinate governments is, by that instrument, turned over to one branch of the Government, which it provides and defines, with certain admonitions only for its guidance. When, therefore, the Constitution is speaking of the "powers of Government," and engaged in the work of distributing them to different departments and securing absolute independence to each department by providing that each shall be worked and managed by a different set or class of individuals, of what Government is it talking? Certainly not of town, city, village or county governments, which it does not undertake to organize, which are not being established, but are to be established hereafter by a body which the Constitution is at the time creating and organizing. Obviously it is talking about the government upon which it is at work, and it is the powers of that government alone which it is declaring, distributing and guarding; that is to say, the State Government, as contradistinguished from those which are to be hereafter created by legislative will, merely, as the incidents and auxiliaries of the former. The departments, therefore, of which it speaks, and in respect to which it provides that no person employed in one shall be employed in either of the other two, are the Departments of the State Government, as expressly defined and limited in the Constitution; and its meaning is that no member of the Legislative Department, as there defined, shall at the same time be a

member of the Executive or Judicial Departments, as there defined, and *vice versa.* That is to say, no judicial officer shall be Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General or Surveyor General, all of whom, and none others, in the sense of the Third Article of the Constitution, belong to and constitute the Executive Department of the Government; or a member of the Senate or Assembly, which two bodies, and none other, in the sense of the Third Article of the Constitution, constitute the Legislative Department. So of each officer of the Executive Department—he cannot belong to the Judicial or Legislative Department. That is to say, he can hold no judicial office, nor the office of Senator or member of the Assembly. And so of Senators and members of the Assembly—they can hold no judicial or executive offices comprised within the Executive and Judicial Departments, as defined in Articles V and VI.

In short, the Third Article of the Constitution means that the powers of the *State* Government, not the local governments thereafter to be created by the Legislature, shall be divided into three departments, and that the members of one department shall have no part or lot in the management of the affairs of either of the other departments, " except in the cases hereinafter expressly directed or permitted."

That such is the true meaning is further apparent from the mere order and arrangement of the several parts of the Constitution. It is divided into separate Articles. Each Article treats, in the main, of a particular subject, to the exclusion of other matters, which subject is stated at the head of the Article; thus the First Article is entitled " Declaration of Rights;" the second, " Right of Suffrage;" the third " Distribution of Powers;" the fourth, " Legislative Department;" the Fifth, " Executive Department;" the sixth, " Judicial Department;" and so on to the end. From this arrangement alone it is apparent that the Legislative, Executive and Judicial Departments created and restricted in the Third Article are the identical departments, and none other,

separately provided for in the immediately succeeding Articles numbered Four, Five and Six.  Article Third provides that there shall be three departments, giving to each its appropriate name.  Articles Four, Five and Six continue the subject by organizing them under the names already adopted, and prescribing their several functions.

Our conclusion is still further strengthened when we search the subsequent parts of the Constitution for those cases in which the members of one department are allowed to exercise functions which properly belong to one of the other departments.  It is often said that the exception proves the rule.  It is so in the present case, if further proof is required.

There are several cases mentioned in subsequent parts of the Constitution, in which the members of one of the departments, as we have defined them, are, in the language of the exception to the Third Article, "expressly directed or permitted" to intermeddle with the functions of the other departments, while we have been unable to find, and, therefore, venture to assert that there are no such cases affecting offices or officers' functions or duties, which are subordinate, or, in other words, not declared by the Constitution itself to belong to one or the other of the three departments therein defined.

Section eight of Article IV provides that each House of the Legislature shall judge of the qualifications, election and returns of its own members.  To do so is to exercise judicial functions, as is well settled—functions which every Court that tries the title to an office or a contested election case must necessarily exercise.

Section ten of the same Article provides that each House may try its own members, and deprive them of their seats or offices by expulsion—which is of the same functional character as that just noticed.

Section eighteen of the same Article provides that the Assembly shall have the power of impeachment, and that the Senate shall try cases of that character.  In doing so

the Assembly performs the part of Public Prosecutor or Attorney General, and the Senate sits as a Court and performs the functions of a Court.

Section four of Article V provides that the Legislature shall canvass the votes given for Governor, and declare the result. In doing so they exercise functions which in their nature are judicial, as is well settled.

Section eleven of the same Article provides that, in the event there specified, the Governor, who is the head of the Executive Department, may interfere with the Legislative Department, and adjourn its sessions.

By section thirteen of the same Article it is provided that the pardoning power shall be exercised by the Governor in certain cases, and by the Legislature in certain other cases.

By section sixteen of the same Article it is provided that the Lieutenant Governor, who ranks second in the Executive Department, shall be President of the Senate and have a casting vote in that body, being, thereby, allowed to participate in the exercise of legislative functions.

That these provisions are the ones referred to in the exception to Article III, admits of no doubt. They all relate to offices and officers created by the Constitution itself, as constituting a part of one or the other of the several departments mentioned in the Third Article, as interpreted by us. By their relations to the subject and by their scope and purport, the scope and purport of the rule from which they are excepted is well if not conclusively illustrated.

A still further argument in support of our view may be drawn from the reason and policy by which the Third Article of the Constitution was manifestly dictated. Under the Constitution of England, from which country most of our forms and jurisprudence are derived, and with the Constitution of which the earlier statesmen of America were most familiar, the powers of Government were divided, and still are, into but two departments—King and Parliament—the former representing the executive and all the judicial power, except such as was exercised in certain cases by the latter. In the

earlier periods of English history the King actually presided *in Aula Regis*—the rude Court of the times—and, in person, declared the law as well as executed it. This possession of the power to both declare and execute the law, by the same department of the Government, led to frequent abuses, with which the framers of American Constitutions were familiar, and against which they therefore sought to provide a safeguard by separating the judicial from the executive and legislative powers, so far as it could be done without stripping either of the latter of such judicial powers as are indispensable to the proper and efficient working of their own more appropriate functions. Hence the rule that there should be one department to make the law, one to declare the law, and another to execute the law; and, to secure so far as possible all the advantages of such a rule, the further rule that each department should be composed of different persons, or—which amounts to the same thing—that persons vested with the functions of one of the departments should not exercise the functions of either of the others, except in cases expressly directed or permitted in the Constitution itself.

The mischief, however, against which they sought to provide, did not come from inferior or subordinate officers, but from the higher grades, in whose hands the first and leading powers of the Government were vested. So far as the former were concerned, they were sufficiently under the control of the latter. Abuse of power could not come from the former in such measure as to destroy or overthrow the liberties of the people, except by the direction or connivance of the latter. To surround the latter with checks was a sufficient protection against the former. Hence, the framers of American Constitutions were content with checks upon the latter, leaving the former, as we consider, to be regulated by the Legislative Department.

We add, in conclusion, that the same provision exists in most of the American Constitutions, and that under most of them legislation of like character as that under consideration

has been had, and, so far as we are advised, its validity has never been questioned. We do not deem it necessary to enlarge upon this branch of the argument. It will be found fully presented in the very able brief filed by counsel for appellant in *Burgoyne's Case.* We will, however, refer to one case. As is well known, the Third Article of our Constitution was copied from the Constitution of Iowa. In the case of *Santo* v. *The State of Iowa,* 2 Iowa, 220, its meaning was brought in question. That case is on all fours with that of *Uridias* v. *Morrill, supra.* The question was, whether the same person could hold the offices of Mayor and Justice of the Peace in the City of Keokuk. The Court said : "The objection intended is that the Mayor is an executive officer, and that judicial authority is conferred upon him in conflict with that provision of the Constitution which says that no person charged with the exercise of powers properly belonging to one of these departments—the Executive, the Legislative, or the Judicial—shall exercise any function appertaining to either of the others. These ' departments ' are the Departments of the Government of the State of Iowa. The Mayor of the City of Keokuk is not a part of the Government of Iowa. He exercises none of the functions belonging to that department. Whatever executive offices he may perform pertain to him only as an officer of that corporation. But we do not mean to say that he is an executive officer in any proper sense. Similar provisions exist in the Constitutions of all or nearly all the other States, and yet from time immemorial similar powers have been conferred upon the Mayors of cities. We are of opinion that the objection is not well taken."

The error in the former decisions of this Court lies in the fact that the meaning of the Third Article was made to turn altogether upon the signification of the word " functions " in the abstract, to the utter disregard of its signification in the concrete. The limitations imposed upon it by the other words and members of the Article were entirely ignored. Sever the word " functions " from the qualifying phrases

" belonging to one of these departments " and " appertaining to either of the others," and its abstract meaning becomes the rule of interpretation and the limit of action to every officer known to the Constitution or laws, from Governor down to Constable.   Read it as modified by the other words or phrases with which it is associated, and the result is such as we have announced.

The utter fallacy, as well as the absurd results of the rule in *Burgoyne's Case*, is aptly illustrated by the peculiar facts of *Sanderson's Case*.   Under a statute then in force, the Chief Justice of this Court was constituted (*ex officio*) a Trustee of the State Library.   Independent of any supposed iron rule of the Constitution, there can be no sound reason in the line of governmental science why the Chief Justice of this Court should not be allowed to exercise the functions of that office.   On the contrary, there is a manifest fitness and propriety in his doing so, for one department of that institution is mainly designed for the use of the bench and bar, at the head of which stands the Chief Justice of this Court; and the performance of the duties of Trustee could in no respect cross any rational purpose which the framers of the Constitution could have intended to subserve by declaring that the several departments of the Government should be kept independent of each other.   His exercising the functions of such a trust could, it is conceived, in nowise tend to the abuse of power, the oppression of the people or the subversion of their liberties.

The utter absurdity, if we may be pardoned the expression, of the rule in *Burgoyne's Case* may be further illustrated by pushing it to logical consequences still more remote.

The County Coroner, under the Act regulating his office, is required to hold inquests.   In doing so he manifestly exercises functions which, in their nature, are judicial. According to the logic of *Burgoyne's Case*, he is, therefore, a judicial officer, and cannot exercise functions which are executive in their nature; yet there is a law by which he is required to perform the duties of Sheriff when the latter,

from any cause, is disqualified from acting. Is this condition of things unconstitutional? Is it opposed to any supposed constitutional policy? Are its tendencies so mischievous as to demand a constitutional prohibition? Is it at war with popular forms, or subversive of popular liberty? All this must have been the case, in the estimation of the framers of the Constitution, according to the rule in *Burgoyne's Case.*

Under a provision of our Practice Act a Sheriff is authorized, with a jury of six men, to try the title to personal property as between the defendant in an execution and a claimant. In doing so he exercises judicial functions. Is the statute, therefore, unconstitutional? It has never been so suggested, yet it must be, according to the rule in *Burgoyne's Case.*

The fallacy of the rule in that case might be further illustrated, but we think it unnecessary. If we have not yet made it apparent, no amount of illustration or argument can have that effect.

Our conclusion is that there is nothing in the Third Article of the Constitution which prohibits a judicial officer from exercising functions, not in their nature judicial, if they do not belong to either the Legislative or Executive Departments, as they are defined and limited in the Constitution itself, as interpreted by us.

Judgment affirmed.


SAWYER, C. J., concurring specially:

The characteristics of many powers and duties are so marked that there can be no difficulty in determining whether they belong to the Legislative, Executive or Judicial Departments of the Government. But the lines between the several departments are not defined with precision; and there are other powers and duties that partake of the nature of duties pertaining to more than one of these departments, and may as properly be referred to one as the

other, or may not strictly belong to either. (*In re Cooper*, 22 N. Y., 81, 82; *People* v. *Supervisors of El Dorado County*, 8 Cal. 58; *Stone* v. *Elkins*, 24 Cal. 127; *Miller* v. *Board of Supervisors Sacramento County*, 25 Cal. 97; *Emery* v. *Bradford*, 29 Cal. 85.) The appointment of an officer, is not strictly, or essentially, an executive, or ministerial duty, nor is it strictly, or essentially, legislative, or judicial. The general rule in this State is, that public officers, of the higher grades, at least, are chosen by the people themselves, yet the people in the election of public officers are not supposed to be charged with the performance of either legislative, executive or judicial functions within the meaning of the Third Article of the Constitution. Other modes of designating the party who shall fill an office, are exceptional. The Constitution itself recognizes appointments by different departments of the Government. The Legislature has authority under the Constitution to create many offices, and to provide the mode of filling them. (Constitution, Art. XI, Sec. 6.) Some are filled by the Legislature itself; some are authorized by the Act creating the office, to be filled by the Governor; some by an election by the people, and some by an appointment by other officers. The Legislature, if so disposed, might provide that offices created by itself should be filled by appointment made by certain citizens named, having no official relation to either department of the Government. The matter is left entirely to the discretion of the Legislature. When a vacancy occurs, and there is no other mode provided, the Constitution authorizes the Governor to fill it for the time being—temporarily only—till it can be filled in the regularly appointed mode. (Art. V, Sec. 8.) The duty in the latter case becomes executive in its character, not because it is such in the essential nature of the Act, but because, under the particular circumstances, the Constitution in the given case devolved it upon the Governor. The power is exceptional, and is only conferred in default of any other designated mode, in order that the public interests may not suffer detriment from a vacancy, when the law has provided no

specific means of filling it. The duties of police officers are executive in their nature. But the designation of the person, who is to act in the capacity of a police officer, ends with the appointment, and is not strictly or exclusively either a legislative, executive or judicial function, within the meaning of Article III of the Constitution, and is not prohibited to either department. It is certainly not a mere ministerial duty.

The person to be appointed is required to have certain qualifications. He must be a citizen of the United States and of the State, and a resident and a qualified voter of the city and county, and he must be " of good repute for honesty and sobriety;" and he is required to produce evidence to this effect to the Police Commissioners. (Sec. 24.) The examination of these questions, passing upon the sufficiency of the evidence and determining whether the candidates possess the requisite qualifications, are certainly functions partaking essentially of a judicial character. So the power of removal, which is, ordinarily, correlative to the power of appointment, is devolved upon the Police Commissioners. They are to try all charges of oppression or official misconduct, and, if the officer charged is found guilty, remove him. (Sec. 28.) The act of appointment involves an examination of evidence and determination of the questions whether the party possesses the requisite qualifications, and the act of removal upon charges of misconduct, involves a trial for the offense charged, and a determination that the party is thereby disqualified for the duties of so important an office. No one, I presume, would say, that the latter functions do not partake of a judicial character; yet they are no more so than the former. And the functional character of the act of appointment, and of the act of removal, after the preliminary facts upon which they are based are ascertained, is precisely the same.

While police officers may have other duties to perform with reference to the peace and good order of society, they are also expressly made the executive officers of the Court.

(Laws 1856, pp. 151–53, Secs. 17–26.)   Their duties are in great part immediately connected with the Court.   In participating in the appointment of police officers, the Police Judge is not executing the process of his Court, or performing any other mere executive act, but is providing an instrument by means of which the executive duties pertaining to his Court, and other duties relating to the execution of the laws, are to be performed.   He is to examine into the qualifications of candidates and determine their fitness for the duties required, and, as the result of the determination, appoint or reject.   (Secs. 24, 25, 27, 28.)   With this result his functions end, and the performance of the executive duties pertaining to the office then devolve upon the officer appointed.   As in all other matters pertaining to proceedings by judicial officers, the duties of the executive officer begins when those of the Judge end.   So far as a police officer, as an executive officer of the Police Court, is concerned, he is as much an appendage to the Court as a referee appointed by a Court of law or equity to try an issue or take testimony, or a master in chancery, or a receiver.   The duties of these several officers, when appointed, may be different, those of one being essentially executive, of another judicial, and still another, perhaps, of a mixed character; yet the character of the act of appointment is in all essentially the same.   While the power to participate in the appointment of police officers may not be strictly judicial, yet, in my judgment, it is neither strictly a legislative or executive function, and neither department of the Government is especially charged with its exercise by the Constitution.   And the Constitution only forbids persons charged with the exercise of powers belonging to one department from the exercise of functions pertaining to the other.   The powers, thus referred to, must be powers which, in their essential nature, strictly belong to one department, or which are, in express terms, devolved upon one department.   For there are many acts that have features at the same time pretaining to more than one department, and which cannot be separated, and each part of the act distrib-

uted to its appropriate department. To attempt to do it would be to render the adminstration of the Government and the laws impracticable.

I can, therefore, see no valid constitutional obstacle in the way of charging the Police Judge of the City and County of San Francisco, as a member of the Board of Police Commissioners, with this duty.

This view does not appear to me to be in conflict with any of the somewhat numerous cases which have arisen under the constitutional provision under consideration, and it is unnecessary to review those cases, or point out the peculiar and distinguishing characteristics of each.

I deem it proper to add that, in my judgment, if the principles supposed to be established by the case of *Burgoyne v. Supervisors of San Francisco* were more doubtful than they are, the case has been too often affirmed, and too long regarded as settling the construction of the Constitution upon the point involved, to justify a re-examination as an original question. It was thoroughly and elaborately argued by counsel fully competent to the task, and maturely considered. The question was also in subsequent cases elaborately argued and considered, and the case re-affirmed, till, in later cases, it has been followed without further question by bench or bar—the effort being to distinguish the cases as they arose. Most, if not all, of our predecessors have had occasion to consider the question in some form, and have acquiesced in the construction, if they have not expressly affirmed it. If anything can be regarded as settled, the construction of the Constitution on this point ought to be so regarded, especially as the Constitution has been amended since discussion ceased, and the inconvenience of the construction established was not found sufficient to suggest an amendment.

The counsel in this case do not directly make the point that the decision referred to is erroneous, but content themselves with maintaining that the case now under consideration is consistent with the prior decisions. For these reasons, I

shall decline to enter into a discussion of the propriety of the construction established. Cogent arguments can doubtless be urged upon both sides; but this is a reason for allowing the construction to stand, rather than for disturbing it.

The only remaining question is: Does any statute authorize the Police Judge to act in the appointment of police officers? That such authority was found at one time under the Consolidation Act is conceded; but, it is claimed, that the provisions of that Act have been superseded by subsequent Acts passed in pursuance of the amendment to section ten, Article VI, of the Constitution, requiring the Legislature to fix by law the jurisdiction of inferior municipal Courts, and the powers, duties and responsibilities of their Judges; that the Judiciary Act of 1863, and the Act of January 27th, 1864, (Laws 1863, p. 344, and Laws 1863-4, p. 30,) cover the entire subject matter of the jurisdiction and powers of the Police Court and the Police Judge, and that, as the subject of appointing Policemen is not mentioned in either, it is reasonable to conclude, that the Legislature did not design to continue this power.

The object of the Consolidation Act of 1856, was, to consolidate the city and county governments of the City and County of San Francisco into one, and provide a local, municipal, corporate government for the territory within the designated boundaries. As subordinate and incidental to the main object, a Police Department was established embracing a Police Court, with a Police Judge, Clerk, Chief of Police and other subordinate police officers, such as usually constitute the executive branch of the Police Department in cities. Sections nineteen and twenty relate to the Police Court and Police Judges, and prescribe the jurisdiction and powers of the Court and Judge, strictly as such, and the course of proceedings in said Court. Sections twenty-three, twenty-four, twenty-five, twenty-six, twenty-seven and twenty-eight provide for the appointment, super-

69

vision, trial and removal of the subordinate police officers, and prescribe their qualifications. And it is provided that the appointment shall be made by the Chief of Police, President of the Board of Supervisors and the Police Judge—the concurrence of two being necessary to a choice.

The Board of Supervisors, in their ordinances organizing and regulating the Police Department under section seventy-four, authorizing them to regulate the police and police force of said city and county, have designated these officers, with reference to this duty, the "Board of Police Commissioners;" and they have become known and recognized by this name. The duty assigned them, as we have before seen, is not strictly legislative, executive or judicial, and does not strictly or properly belong to either department of Government, in the sense of the Constitution, and is not forbidden to either, but may be performed by any one, alone or all combined, or it might be performed by the people themselves, or by any other persons authorized by the Legislature, having no official relation to either department of the Government.

The Legislature has chosen to impose the duty of selection upon the three officers named. There has been no direct repeal of these sections, and no Act passed in any respect inconsistent with their provisions, so far as they affect the Police Judge.

No other mode has been provided for appointing Policemen, and, unless these sections are still in force, there is no mode of appointment. The Judiciary Act of 1863, and the Act of January 27th, 1864, " to prescribe the jurisdiction of the Police Judge's Court of the City and County of San Francisco," only relate to the powers of the Police Court and Judge, which are strictly judicial and properly belong to them, *as a Court,* and *as a Judge.* Their provisions relate only to the powers embraced in section nineteen of the Consolidation Act. No reference is made to the other branch of the Police Department, of the City Government, provided for in section twenty-three *et seq.* These Acts, therefore, do not embrace the entire subject matter of Article II of the

Consolidation Act, and only supersede that portion covered by its provisions. It cannot be supposed that the Legislature designed to repeal so important provisions of the Act without providing any substitute, by mere silence—by saying nothing about it. That body, evidently, only designed to legislate upon those *functions of a strictly judicial character*—which pertained to the Court and Judge *as such*—and not upon those duties which another branch of the law has imposed upon the person holding the office of Police Judge in connection with other persons, as a member of a separate and distinct Board, exercising functions not strictly judicial. And this view is strengthened by a consideration of other acts in *pari materia* subsequently passed at the same session of the Legislature. In the Act of April 4th, 1864, to confer additional powers upon the Board of Supervisors, etc., (Laws 1863–4, p. 502,) the twelfth subdivision of section one confers authority upon the Board " to authorize and empower the Police Commissioners of said city and county to appoint and to regulate *local* Policemen whenever," etc. The Legislature must have referred to the officers named in section twenty-three of the Consolidation Act, and designated in various ordinances of the city by the name " Police Commissioners," for there are no others to whom the term could have applied. This Act in *pari materia* shows clearly that the same Legislature, which passed the Act of January 27th, 1864, did not suppose they had in any way abrogated these provisions of the Consolidation Act. They recognized the existence of the Board of Police Commissioners, and authorized the Board of Supervisors, in addition to its functions respecting the general police force of the city, to confer additional powers to appoint and regulate *local* Policemen. I am satisfied that the Acts of 1863 and 1864 cited, in no respect affected those provisions of the Consolidation Act relating to the Police Judge, as a member of the Board of Police Commissioners, and that said provisions are in full force, and authorize that officer to perform the duties therein prescribed. I am of opinion, therefore, that the judgment

of the District Court is correct, and concur in the judgment of affirmance.

RHODES, J., dissenting:

I concur with Mr. Justice Sanderson in his reasoning and conclusion upon the first point. Upon the second point, without expressing an opinion as to the conclusiveness of his argument, it is sufficient to say that I am not prepared to overrule a series of decisions almost continuous from *Burgoyne's Case*, in 1855, to the present time, and therefore dissent from the judgment.