[L.A. No. 30009. In Bank. Mar. 25, 1974.]

COREEN STRUMSKY, Plaintiff and Appellant, v.
SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION,
Defendant and Respondent.

**COUNSEL**

Linley, McDougal, Meloche & Murphy and Donald L.. Meloche for Plaintiff and Appellant.

Robert G. Berrey, County Counsel, and Joseph Kase, Jr., Deputy County Counsel, for Defendant and Respondent.

John D. Maharg, County Counsel (Los Angeles), Edward H. Gaylord and Martin E. Weekes, Deputy County Counsel, as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**SULLIVAN, J.**—In the instant case we confront a question concerning judicial review of adjudicatory determinations of administrative agencies which we were not called upon to reach in *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242]. That question, whose presence was expressly noted by us in *Bixby* (*id.* at p. 137, fn. 2) is this: When, upon judicial review of an administrative order or decision pursuant to section 1094.5 of the Code of Civil Procedure, it is claimed there has been a prejudicial abuse of discretion in that the findings are not supported by the evidence, what is the proper scope of review when the respondent agency is a local agency or a state agency of local jurisdiction?

If anything has remained consistently clear in the checkered history of the judicial review of administrative decisions under section 1094.5, it has been the answer to the foregoing question. Subdivision (c) of that section provides that when a claim of unsupported findings is made, abuse of discretion (which under subdivision (b) is established if the findings are not supported by the evidence) is shown *in cases in which the court is authorized by law to exercise its independent judgment on the evidence* if the court determines that the findings are not supported by the *weight* of the evidence; *in all other cases* abuse of discretion is established if the court determines that the findings are not supported by *substantial evidence in light of the whole record*. It has been veritable gospel, at least since the decision of this court in *Standard Oil Co.* v. *State Board of Equal.* (1936) 6 Cal.2d 557 [59 P.2d 119]—which is the fountainhead from which all subsequent law of judicial review of administrative decisions, including section 1094.5 itself, has sprung—that with respect to orders

or decisions of local agencies or state agencies of local jurisdiction the court *is not* authorized by law to exercise its independent judgment on the evidence, and therefore that the proper scope of review with respect to such orders or decisions is that of substantial evidence in light of the whole record. It is this axiom which is challenged here today.

After solemn and extended consideration we have concluded that there no longer exists any rational or legal justification for distinguishing with regard to judicial review between, on the one hand, local agencies and state agencies of local jurisdiction and, on the other, state agencies of legislative origin having statewide jurisdiction. Accordingly, we hold that the rule of judicial review applicable to adjudicatory orders or decisions of the latter class of agencies—which was reaffirmed and explained by us in *Bixby*—is also applicable to adjudicatory orders or decisions of agencies in the former class. That rule is as follows: If the order or decision of the agency substantially affects a fundamental vested right, the trial court, in determining under section 1094.5 whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in the light of the whole record.

As we explain below, we have concluded that the order and decision in the instant case does affect a fundamental vested right; accordingly the independent-judgment standard stated above is here applicable. Because the trial court in denying the writ considered itself bound by existing law to apply the substantial-evidence standard of review, we reverse the judgment and remand the cause for a new determination under the rule we announce today.

I

Plaintiff Coreen Strumsky appeals from a judgment denying her petition for a writ of mandate sought to review and set aside the decision of the Board of Retirement (Board) of defendant San Diego County Employees Retirement Association denying her certain death benefits.

Plaintiff is the widow of Richard D. Strumsky, who died in 1968 follow-

ing surgery to correct a congenital narrowing of the aorta. At the time of his death Mr. Strumsky was a sergeant in the San Diego County Marshal's office and was in charge of its El Cajon branch; he had been employed by the county for 21 years and for many years had been a "safety member" (see Gov. Code, § 31469.3) of the San Diego County Employees Retirement Association.

Pursuant to the provisions of the County Employees Retirement Law of 1937 (Gov. Code, § 31450 et seq.), plaintiff made application to the Board for the service-connected death allowance established by section 31787 of the Government Code. That section provides in substance and as here relevant that the surviving spouse of a member who dies as the result of an injury or disease arising out of and in the course of his employment is entitled to elect, in lieu of the normal death allowance established by section 31781.1,[1] a lifetime allowance amounting to half the member's salary at death. In the case of Mrs. Strumsky, the service-connected death allowance would be almost three times the nonservice-connected death allowance of $181.03 per month.

The Board held a hearing on the question of service-connection. Five witnesses testified, and documentary evidence, including the written reports of four doctors, was introduced. The evidence established clearly that decedent had suffered from hypertension since boyhood due to a congenital narrowing of the aorta; that this condition was aggravated by progressive arteriosclerosis which had become advanced at a point one year prior to his death; and that the unsuccessful surgery was undertaken in order to correct the aortal narrowing or coarctation and thus relieve the severe hypertension which it and the arteriosclerosis had combined to bring about. There was, however, considerable conflict in the evidence concerning the extent to which the stress and tension inherent in decedent's occupation and his personal attitude toward his job affected the development of the arteriosclerosis. On this point the evidence ranged widely from an opinion that the stress and tension of decedent's employment was responsible only to "an infinitesimal extent" for his condition, to an opinion that the arteriosclerosis may have been substantially related to chronic tension. The theory supporting the latter view was that the hypertension caused by decedent's congenital condition was supplemented and exacerbated by occupational

---

[1]Generally speaking, the normal (i.e., nonservice-connected) death allowance provided for by section 31781.1 of the Government Code is equal to 60 percent of the retirement allowance the decedent would have received had he retired or been retired for nonservice-connected disability on the date of death.

tensions and that the heightened hypertension caused by this combination brought about the arteriosclerotic condition.

The Board by a vote of four to three denied Mrs. Strumsky's application for a service-connected death allowance. Her request for a rehearing was denied, and she thereupon sought review of the decision by administrative mandate. (Code Civ. Proc., § 1094.5.) The trial court denied the writ, finding that "the findings of respondent Board are supported by substantial evidence in the light of the whole record." The court also made the following supplemental finding of fact: "7. That the Court, if this were a case in which the Court was authorized by law to exercise its independent judgment on the evidence, would find that the death of the decedent safety member Richard D. Strumsky was service-connected in nature."

The court thus concluded that there was no prejudicial abuse of discretion committed by the Board and that the alternative writ of mandate theretofore issued should be discharged and the petition for the peremptory writ denied. Judgment was entered accordingly. This appeal followed.

## II

In *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, at pages 144-147, we explained the considerations which counsel in favor of fuller judicial review in cases involving vested, fundamental rights. ■ The essence to be distilled is this: When an administrative decision affects a right which has been legitimately acquired or is otherwise "vested," and when that right is of a fundamental nature from the standpoint of its economic aspect or its "effect . . . in human terms and the importance . . . to the individual in the life situation," then a full and independent *judicial* review of that decision is indicated because "[t]he abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction." (*Id.* at p. 144.)

■ This reasoning, of course, applies with equal force to all administrative decisions of an adjudicatory[2] nature—regardless of the administra-

---

[2]To be distinguished from adjudicatory determinations of an administrative agency are actions undertaken by such an agency in its legislative capacity. Review by means of section 1094.5 of the Code of Civil Procedure is not available with respect to acts of this kind, and when review is sought by means of ordinary mandate (Code Civ. Proc., § 1085) " 'judicial review is limited to an examination of the proceedings before the [agency] to determine whether [its] action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether [it] has failed to follow the procedure and give the notices required by law.' " (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83], quoting from *Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 605 [241 P.2d 283]; see generally Cal. Adminis-

tive agency involved. It has been held inapplicable, however, in the case of agencies which fall into two categories. The first of these categories is comprised of agencies of constitutional origin which have been granted limited judicial power by the Constitution itself. (See, for example, *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634 [234 P.2d 981]; *Covert* v. *State Board of Equalization* (1946) 29 Cal.2d 125 [173 P.2d 545]; *Ishimatsu* v. *Regents of University of California* (1968) 266 Cal.App.2d 854 [72 Cal.Rptr. 756]; *Palm Springs T. Club* v. *Cal. Horse etc. Bd.* (1957) 155 Cal.App.2d 242 [317 P.2d 713]; cf. *Alta-Dena Dairy* v. *County of San Diego* (1969) 271 Cal.App.2d 66 [76 Cal.Rptr. 510].)[3] In the second category are the agencies with which we are concerned in the instant case, to wit, "local agencies"—which includes both purely local agencies and state agencies of limited territorial jurisdiction. (See, for an example of the latter, *Atchison etc. Ry. Co.* v. *Kings Co. Water Dist.* (1956) 47 Cal.2d 140 [302 P.2d 1].) It is established that when review of a decision of an agency falling within either of these two categories is sought pursuant to section 1094.5 of the Code of Civil Procedure, the court's scrutiny of the agency's factual findings is limited to a determination whether those findings are supported by substantial evidence in light of the whole record —and this is so *whether or not* the decision of the agency affects a fundamental vested right.

The roots of the indicated distinction insofar as it relates to so-called "constitutional agencies" can be traced to their ultimate source in one of our most fundamental constitutional doctrines, that of separation of powers. That doctrine, which has been a part of the Constitution of this state since its inception, is presently expressed in article III, section 3 as follows: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others *except as permitted by this Constitution.*" (Italics

trative Mandamus (Cont.Ed.Bar 1966) § 2.9, pp. 18-19, cf. *Manjares* v. *Newton* (1966) 64 Cal.2d 365 [49 Cal.Rptr. 805, 411 P.2d 901], and Comment, *Quasi-Legislative Acts of Local Administrative Agencies: Judicial Review* (1972) 7 U.S. F.L.Rev. 111.) Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts. (See *Wulzen* v. *Board of Supervisors* (1894) 101 Cal. 15, 24 [35 P. 353]; *Smith* v. *Strother* (1885) 68 Cal. 194, 196-198 [8 P. 852].)

[3]Although the state of certain agencies as members of this category has been clearly established, the status of certain others remains unclear pending judicial determination of that question. (See generally Cal. Administrative Mandamus, *supra,* § 5.68, pp. 77-80, and Appendix A of the same work; see also Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959* (1960) 12 Stan.L.Rev. 554, 562-565.)

added.)[4] It is the italicized proviso which forms the basis for the exercise of judicial powers by so-called "constitutional agencies"; insofar as specific constitutional provisions relating to the individual agencies in question directly vest judicial power in them, the agencies so favored can perform judicial functions to the extent of the grant without offending the doctrine of separation of powers. (See *Covert* v. *State Board of Equalization, supra,* 29 Cal.2d 125, 132; see also Cal. Administrative Mandamus, *supra,* §§ 1.3, 5.67, pp. 5, 76.) Thus, even though a vested fundamental right be involved, the determination of the agency on factual issues is entitled to all the deference and respect due a judicial decision.[5]

With respect to "local agencies" the matter is otherwise. This is so for the simple reason that the separation of powers clause is inapplicable to government below the state level. (*People* v. *Provines* (1868) 34 Cal. 520.) Accordingly that clause does not *prevent* the exercise of judicial powers by "local agencies." (*Imperial Water Co.* v. *Supervisors* (1912) 162 Cal. 14, 17-18 [120 P. 780]; *Nicholl* v. *Koster* (1910) 157 Cal. 416, 422-423 [108 P. 302]; *Holley* v. *County of Orange* (1895) 106 Cal. 420, 424 [39 P. 790]; *Wulzen* v. *Board of Supervisors, supra,* 101 Cal. 15, 25-26; *Savage* v. *Sox* (1953) 118 Cal.App.2d 479, 485-487 [258 P.2d 80]; *People* v. *Strong* (1931) 114 Cal.App. 522, 527-528 [300 P. 84].) This, however, is not the end of the matter; the fact that agencies below the state level are not *prevented* from exercising judicial powers by the separation-of-powers doctrine in no way implies in and of itself that they *may exercise* such powers.[6] Because local bodies, like governmental entities on the state level, ultimately derive all their powers from the state Constitution, it is in that document that we must seek the basis for any exercise of judicial power by such bodies.[7] If no such basis be found, it matters not

---

[4]The quoted section was adopted in 1972. Substantially identical language has appeared in the Constitution since 1849.

[5]The validity of the foregoing rationale for the exercise of judicial powers by "constitutional agencies" is not here in question.

[6]We note what appears to be a contrary opinion on this point among certain commentators. (See Kleps, *Certiorarified Mandamus: Court Review of California Administrative Decisions 1939-1949* (1950) 2 Stan.L.Rev. 285, 291, fn. 23; Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959, supra,* 12 Stan.L.Rev. 554, 561-562; Cal. Administrative Mandamus, *supra,* § 5.65, p. 75.) To the extent that our interpretation of these comments is accurate (i.e., to the extent that they indicate that the inapplicability of the separation-of-powers clause in and of itself constitutes an authorization for the exercise of judicial powers by local boards), we disagree with them.

[7]Although it has been maintained that under the 1849 Constitution local bodies possessed certain "inherent powers" of self-government (see Peppin, *Municipal Home Rule in California: I* (1941) 30 Cal.L.Rev. 1), there is no doubt that since

at all for present purposes that local bodies are not fettered by the separation-of-powers clause in the exercise of the powers which *have* been conferred upon them.

In the landmark case of *Standard Oil Co.* v. *State Board of Equal., supra,* 6 Cal.2d 557, we suggested one possible basis for the exercise of judicial powers by local agencies. The primary holding of that decision, which led to the development of much of our present statutory and decisional law with respect to judicial review of administrative decisions, was that legislatively created agencies of statewide jurisdiction could not under the Constitution exercise judicial powers, and that therefore the decisions of such agencies were not reviewable by certiorari. This holding was based upon article VI, section 1, of the Constitution, which at that time provided as follows: "The judicial power of the State shall be vested in the Senate, sitting as a court of impeachment, in a Supreme Court, district courts of appeal, superior courts, such municipal courts as may be established in any city or city and county, *and such inferior courts as the Legislature may establish in any incorporated city or town, township, county or city and county.*" (Italics added.) We held, quoting from earlier cases, that " *'Except for local purposes* the section disposes of the whole judicial power of the state and vests all of it in the courts expressly named therein, leaving none at the disposition of the Legislature.' " (Italics added.) (6 Cal.2d at p. 561.) Thus, we concluded, the Legislature could not vest judicial powers in agencies of statewide jurisdiction.

It was the italicized exception, however, which in later cases was seized upon as the basis for a different rule with respect to "local agencies." (See especially *Nider* v. *City Commission* (1939) 36 Cal.App.2d 14, 28 [97 P.2d 293]; see also *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 264-265 [246 P.2d 656]; *La Prade* v. *Department of Water & Power* (1945) 27 Cal.2d 47, 53 [162 P.2d 13]; *Walker* v. *City of San Gabriel* (1942) 20 Cal.2d 879, 881 [129 P.2d 349, 142 A.L.R. 1383]; *Corcoran*

the adoption of the 1879 Constitution that notion has had no place in the law of this state. (See *Golden Gate Bridge etc. Dist.* v. *Felt* (1931) 214 Cal. 308, 320 [5 P.2d 585].) The rule in California, and in the vast majority of other states, is stated by the leading commentator in the field of local government as follows: "Unless granted by the state constitution, a municipal corporation [and certainly any other local body] has no inherent right of self-government . . . . The reason upon which this general rule is based is that the municipal corporation is a creature of the legislature, from which, within constitutional limits, it derives all of its rights and powers." (Italics added, fn. omitted.) (2 McQuillin, Municipal Corporations (1966 3d rev. ed.) § 4.82, pp. 144-145; see also McBain, *The Doctrine of an Inherent Right of Local Self-Government* (1916) 16 Colum.L.Rev. 190 & 299.)

v. *S. F. etc. Retirement System* (1952) 114 Cal.App.2d 738, 740-741 [251 P.2d 59].) The rationale, generally speaking, was that article VI, section 1, while forbidding the exercise of judicial powers by legislatively created agencies of statewide jurisdiction, *permitted* the Legislature to vest such powers in such "inferior courts" as it might establish on the local level—and that "local agencies" could be considered to be such "inferior courts." Article XI of the Constitution, which we proceed to examine in some detail *infra,* clearly allowed the Legislature to establish the powers of local bodies such as counties and cities and to approve the powers delineated in city and county charters. These powers, it was reasoned, might include purely judicial powers pursuant to the grant of article VI.

In 1950, in effecting a reorganization of the inferior courts, article VI, section 1, of the Constitution was amended and the language therein upon which the foregoing cases relied was removed.[8]

It is the effect of this amendment which is our primary concern today. For the present, however, it is sufficient to observe that the deletion wrought by the amendment rendered the section no longer available as a basis for the exercise of judicial powers by "local agencies."

Although decided prior to the amendment of article VI, the case of *Dierssen* v. *Civil Service Commission* (1941) 43 Cal.App.2d 53 [110 P.2d 513], gave birth to a rationale which has been relied upon since the amendment to support limited judicial review of the factual findings of "local agencies." Two years earlier in *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75 [87 P.2d 848], this court, in the course of discussing the *Standard Oil* decision and its effect on the powers of state agencies of statewide jurisdiction, had made the following statement: "The theory of [*Standard Oil*] is that, if the Legislature attempted to confer judicial or *quasi*-judicial power [original italics] on state-wide administrative boards, the statutes would be unconstitutional as in violation of section 1 of article VI of the state Constitution, which vests the entire judicial power of the state in the courts, except as to local boards, and the railroad and industrial accident commissions, *which are governed by special constitutional provisions.*" (Italics added.) (13 Cal.2d at p. 81.) Seizing upon the italicized language, the District Court of Appeal in *Dierssen* concluded that it related not only to its immediate grammatical antecedent (i.e., "the railroad and industrial accident commissions") but also to "local boards."

---

[8]Article VI, section 1, now provides: "The judicial power of the State is vested in the Supreme Court, courts of appeal, superior courts, municipal courts, and justice courts. All except justice courts are courts of record."

The *Dierssen* court stated: "Quite obviously, what the Supreme Court had in mind when it stated in the *Drummey* case, *supra,* that, 'local boards . . . are governed by special constitutional provisions,' were the broad provisions of article XI, section 6, of the Constitution dealing with the powers of chartered cities." (43 Cal.App.2d at p. 60.) The court then went on to examine certain provisions of article XI[9] and concluded therefrom: "Under these provisions a chartered city or city and county may lawfully confer *quasi* judicial power on boards or commissions dealing strictly with municipal affairs, such as the power to determine facts, and, if such finding is made, the courts may interfere only where the board acts arbitrarily, capriciously, or fraudulently. Stated another way, the courts are empowered to interfere with the findings of such boards only where a clear abuse of discretion is alleged and proved. If there is any substantial evidence to support the board's findings the courts are powerless to interfere. This is apparently the law even as to state-wide boards where the board has fact finding powers and is not attempting to take away an existing right." (43 Cal.App.2d at pp. 60-61.)

Twelve years later and shortly *after* the 1950 amendment to article VI, the same District Court of Appeal (although composed of two new members) adopted the rationale of its earlier *Dierssen* decision as the primary support for differing standards of review in *Savage* v. *Sox, supra,* 118 Cal. App.2d 479 [258 P.2d 80]. It was there contended that the effect of the amendment was to remove all constitutional support from the distinction in question. The court, rejecting this contention, quoted extensively from *Dierssen.* It also made reference to the arguments before the voters at the time of the amendment and conluded that "the voters in reducing the number of inferior courts never intended to, nor did they, in any way interfere with the rights granted municipalities, counties and cities and counties in the other portions of the Constitution." (118 Cal.App.2d at p. 488.)

We express at the outset our suspicion that the reasoning of *Dierssen* was grounded to a large extent upon a grammatical misunderstanding of the language of this court in *Drummey.* The sentence from the latter case which we have quoted above (see text accompanying fn. 9, *ante*) is concerned with restating the "theory" of *Standard Oil,* such "theory" being in full effect at the time of *Drummey.* In the course of such restatement we indeed indicated that the then article VI, section 1 "vest[ed] the entire

---

[9]Article XI has undergone substantial amendment and reorganization since *Dierssen,* but the provisions upon which the court relied remain in substance.

judicial power of the state in the courts, except as to local boards, and the railroad and industrial accident commissions, which are governed by special constitutional provisions." (13 Cal.2d at p. 81.) It is clear to us, however, that the final clause of eight words in this statement refers only to the seven words next immediately preceding it and not to the phrase concerning "local boards." The only "special constitutional provision" which *Standard Oil* had related to local boards was article VI, section 1 itself, a section which, as indicated above, was amended in 1950 (11 years after *Drummey*) to remove the support which *Standard Oil* had found in it. Thus it is our opinion that the *Dierssen* court was misled at the outset in undertaking its search for *other* constitutional support; all the support necessary at that time was provided by article VI, section 1.

The matter is otherwise when we come to *Savage* v. *Sox, supra.* By the time of that decision article VI, section 1 had indeed been amended and new constitutional justification was necessary to replace it, if the distinction in standards of review was to be maintained. The *Savage* court, by adopting *Dierssen,* likewise adopted the constitutional supports which had been needlessly "discovered" 12 years before: the home-rule provisions of article XI. These it duly installed as the "new" constitutional source of judicial power in "local agencies."

The error in the *Savage* decision is fundamental: it fails to appreciate the relationship between article VI and article XI, and in so doing it totally misapprehends the comprehensive effect of the 1950 amendment on the former article. Article XI does not and cannot stand alone. It invests the Legislature with the authority to bestow powers upon, and to set up procedures for, governmental bodies below the state level. This is carried out for so-called general law (i.e., noncharter) cities and counties by direct legislation of statutes found in the Government Code. With respect to charter cities and counties such powers and procedures are prescribed by means of legislative approval or disapproval of the charter presented to the Legislature. In each case, however, the Legislature is limited in the nature and extent of the powers which it may grant. With respect to legislative powers, the question is one of proper delegation of powers vested in the Legislature itself by article IV of the Constitution.[10] With respect to executive powers, the question is one of avoiding conflict with the executive powers reserved to members of the executive branch in article V. With respect to judicial powers, the question is one of compli-

---

[10]Section 1 of article IV provides: "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum."

ance with the limitations imposed by article VI—a matter which we now proceed to examine in some detail.

As we have indicated above, prior to 1950 article VI permitted the Legislature to establish "inferior courts" on the local level and thus to vest judicial powers to that extent. The Legislature exercised this grant directly by establishing a plethora of local courts at the municipal and township level, including township justice of the peace courts, police courts, city justice of the peace courts, and city courts. In addition, according to the interpretation adopted in *Standard Oil* and its progeny, it exercised the grant by vesting judicial powers in "local agencies."

Article XI of the Constitution was (and today remains) the conduit through which the Legislature vested in "local agencies" whatever powers it was entitled to vest in them. It was and is not, as the *Dierssen* and *Savage* courts assumed, an independent source of power—rather it was and is the instrument by and through which the Legislature takes the powers it is constitutionally entitled to bestow and in turn bestows them at least in part on governmental units below the state level.

With the foregoing in mind, we focus our inquiry upon the effect of the 1950 amendment to article VI. To begin with, we believe that the court in *Savage* v. *Sox, supra,* correctly concluded that the result of the amendment was in part to withdraw from the Legislature the authority to create and bestow judicial powers upon inferior courts at the local level.[11] It is clear that in effect the amendment not only precluded the further creation of such courts *but also* provided for the gradual elimination of those already established[12]—resulting in a concentration of judicial power in constitutionally designated courts. However, the *Savage* court expressly declined to recognize that the amendment had a fuller and more comprehensive effect—in short, that it had the effect of withdrawing from the Legislature the ability to vest judicial power *in any body* and of concentrating in the court system all judicial power not expressly bestowed elsewhere by the Constitution.[13] This result, the *Savage* court concluded, was not intended

[11]The argument against the amendment set forth in the voters' pamphlet clearly indicates that the power of the Legislature in this area was at issue.

[12]Former section 11 of article VI, which was a part of the amendment in question but was repealed in 1966—having served its purpose—treated this aspect of the measure.

[13]By its terms the amendment purported to concentrate *all* judicial power in the courts. This, however, would create a conflict with constitutional provisions which might expressly bestow judicial powers on certain "constitutional agencies" (see fns. 4 and 5 and accompanying text), a possible conflict which we avoid by interpreting the effect of the amendment as indicated.

by the amendment. "The power exerted in this case is a purely municipal affair and the voters in reducing the number of inferior courts never intended to, nor did they, in any way interfere with the rights granted municipalities, counties and cities and counties in the other portions of the Constitution. The elimination of the power of the Legislature to provide other inferior *courts* [original italics] than the municipal and justice courts *still left the constitutional provisions under which the charter of a city and county could lawfully confer quasi-judicial*[14] *powers on boards or commissions dealing strictly with municipal affairs.*" (Italics added.) (118 Cal.App.2d at p. 488.)

As we have suggested, we believe that the analysis of the *Savage* court suffers from a failure to apprehend the relationship between articles VI and XI of the Constitution and a mistaken conclusion that the latter article constitutes an *independent* source of constitutional authority for legislative vesting of judicial power in "local agencies." On the contrary we have concluded that article VI disposes of *all* judicial power not expressly disposed of elsewhere in the Constitution, and that, following its amendment in 1950, it no longer authorized the Legislature, in its granting of powers to various local bodies pursuant to article XI, to grant *judicial* powers. In short, although the Legislature retains the authority to grant a multitude of powers to local bodies pursuant to article XI, powers of a *judicial* nature are no longer at its disposal.[15] Moreover we believe that the amend-

---

[14]We have in this opinion avoided the use of the term "quasi-judicial"—an adjective used in some opinions and by some commentators to indicate the peculiar adjudicatory powers possessed by administrative agencies. As we have indicated, the question here is the extent to which *true judicial powers* are and can be vested in "local agencies." "The mere retreat to the qualifying 'quasi' is implicit with confession that all recognized classifications have broken down, and 'quasi' is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed." (Jackson, J. in *Fed. Trade Comm'n* v. *Ruberoid Co.* (1952) 343 U.S. 470, 487-488 [96 L.Ed. 1081, 1094-1095, 72 S.Ct. 800].)

[15]We note in passing that the Legislature, at least in 1942, was apparently of the view that, even with its then powers under article VI to create "inferior courts," it lacked the ability to bestow judicial powers on "local agencies." In that year the case of *Laisne* v. *Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831 [123 P.2d 457] had been decided; that case, along with the other progeny of *Standard Oil*, had created uncertainty and upheaval concerning the proper role of the courts vis-à-vis legislatively created agencies. The Legislature, recognizing that a constitutional amendment would serve to settle the law in the area, passed (by a two-thirds vote) Senate Constitutional Amendment 8 and presented it to the electorate as Proposition 16 on the November 1942 ballot. Generally speaking, the measure sought to place truly judicial powers in both statewide agencies and "local agencies," limiting court review of *all* factual findings to a substantial evidence basis. Apparently concluding in spite of the *Standard Oil* line of cases and the *Dierssen* case that neither article VI nor article XI provided sufficient constitutional support for this, the

ment to article VI had the effect of withdrawing judicial powers formerly granted pursuant to article XI prior to the amendment, leaving the entire judicial power concentrated in the state court system and some "constitutional agencies."[16]

Legislature proposed, through the above proposition, the following amendment to the latter article: "When any city or city and county, which has adopted or shall adopt a charter in pursuance of this Constitution, has provided or shall provide by charter, by any amendment thereof, or by ordinance, that decisions of question of fact made by any administrative officer, board, commission or agency in respect to municipal affairs shall be final, no court of this State shall have power to set aside such finding of fact if there is substantial evidence to support it. Nothing in this section shall be construed as limiting the power of any county, city, or city and county under this Constitution to make and enforce within its limits local, police, sanitary and other regulations and, when not in conflict with general law, to provide by ordinance that decisions of questions of fact made by any administrative officer, board, commission or agency shall be final." (Proposed Amendments to Constitution, Propositions and Proposed Laws; General Election, Tuesday, Nov. 3, 1942; Part II—appendix, p. 23.) We must conclude from the approval of this language by the Legislature and its presentation to the electorate *almost immediately after the Dierssen decision,* that the Legislature was unpersuaded by the *Dierssen* court's discovery of a grant of judicial powers in the then (and now) article XI.

The electorate, apparently persuaded by the pamphlet argument against the proposition (to the effect that the proposition would shift too much power away from the courts and thus remove existing protections against unjust or arbitrary administrative action) rejected the measure by a three to one margin. (Statement of Vote; General Election, Nov. 3, 1942, p. 37.)

[16]Lest it be considered that we have oversimplified the thrust and meaning of article XI in referring to it as a mere conduit for the granting of powers having their source, if any, elsewhere in the Constitution, we here undertake to review the provisions of that article, giving special attention to the provisions relied upon by the court in *Savage.* Section 1 of the article deals with the formation and government of counties and provides as here relevant that the Legislature shall prescribe procedures for formation, consolidation, and boundary change, and shall additionally "provide for county powers." Section 2, dealing with cities, provides that the Legislature "shall prescribe uniform procedure for city formation and provide for city powers." Section 3 deals in general with the procedure for adopting county and city charters, including the necessity of their approval by the Legislature. Section 4 concerns provisions which are mandatory in county charters, all of which remain subject to legislative approval under section 3; it also provides that "Charter counties shall have all the powers that are provided by this Constitution or by statute for counties."

Section 5, the predecessor section of which was heavily relied upon by the *Savage* court, deals with permissible city charter provisions. Subdivision (a) of section 5 provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters[,] and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith." The *Dierssen* and *Savage* courts perceived in this language a direct constitutional grant allowing charter cities to "confer *quasi* judicial power on

The effect of this conclusion upon the question immediately before us is clear. Because judicial powers may no longer be exercised by "local agencies," the factual findings of those agencies are entitled to no greater deference than those of other agencies lacking judicial powers under the Constitution. Accordingly we conclude that the rule of review which was reaffirmed by us in *Bixby* v. *Pierno, supra,* for application to adjudicatory decisions by legislatively created agencies of statewide jurisdiction is equally applicable to decisions by "local agencies" as well.

We therefore hold that in all such cases, if the order or decision of the agency substantially affects a fundamental vested right, the court, in determining under section 1094.5 of the Code of Civil Procedure whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's

---

boards or commissions dealing strictly with municipal affairs . . . ." (*Dierssen* at p. 60, original italics; *Savage* at p. 487.) Our reading of the language is otherwise. We presume that the provision's use of the term "enforce" was considered significant by those courts, but we do not find in that term any indication that it includes a power to *adjudicate.* The Attorney General has as his constitutional duty "to see that the laws of the State are uniformly and adequately enforced" (Cal. Const., art. V, § 13), but no one would maintain that a power of adjudication is therein contained. Such a conclusion is equally unwarranted here.*

Subdivision (b) of section 5 presently provides: "It shall be competent in all city charters to provide, *in addition to those provisions allowable by this Constitution,* and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees." (Italics added.) Suffice it to say that we do not construe the italicized language to authorize the establishment by a charter city in itself of powers which, since the 1950 amendment to article VI, section 1, have been exclusively vested in the state courts.

Section 7 of article XI provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws."* (Italics added.)

---

*"ENFORCE refers to requiring operation, observance, or protection of laws, orders, contracts, and agreements by authority, often that of a whole government or of its executive or legal branches. . . ." (Webster's Third New Internat. Dict. (1963) p. 751.)

inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in light of the whole record. So that there will be no misunderstanding, we emphasize that this rule shall apply to all pending and future proceedings in trial courts and all pending and future appeals.

## III

We have concluded that the decision of the Board in this case substantially affected a fundamental vested right, to wit, plaintiff's right to receive a service-connected death allowance.

It has long been established that retirement benefit rights of the nature here involved are vested. (See *Pearson* v. *County of Los Angeles* (1957) 49 Cal.2d 523, 531-532 [319 P.2d 624]; *Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 183 [265 P.2d 884]; *Dryden* v. *Board of Pension Commrs.* (1936) 6 Cal.2d 575, 579 [59 P.2d 104].) We also believe that the right here in question is not only vested but "fundamental" within the meaning of *Bixby* v. *Pierno, supra.* "In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (4 Cal.3d at p. 144.) It is the latter consideration which renders the instant right fundamental. Above and beyond the "economic aspect" present in all pension cases, we have here a situation in which the benefits sought might well mean to the officer's widow the difference between self-support and the necessity that she supplement pension income through employment or other means.[17] Thus, the impact in human terms of the decision is manifest.

It is urged, however, that we are here concerned not with the right to death allowance itself but with the *amount* of the allowance. Whereas the right to *an allowance* might be considered vested and fundamental, it is argued, the right to an allowance in a particular amount is not. We believe that this objection fails to recognize the realities of the situation before us. Putting to one side the practical consideration expressed above—i.e., that the service-connected allowance provides the possibility of self-support, whereas the residual allowance does not—we think that the statutory scheme governing death benefits for county employees contemplates what are in effect two different benefits, one which is service-connected (Gov. Code, § 31787) and one which is not (Gov. Code, § 31781.1). It is true that the wife had no vested right in either of these pensions until

---

[17]As we have pointed out above (see text accompanying fn. 1, *ante*) the service-connected death allowance in Mrs. Strumsky's case would be almost three times the nonservice-connected allowance of $181.03 per month.

the happening of the contingency upon which the benefits were payable (see *Packer* v. *Board of Retirement* (1950) 35 Cal.2d 212, 215-218 [217 P.2d 660]; *Sweesy* v. *L. A. etc. Retirement Bd.* (1941) 17 Cal.2d 356, 361-363 [110 P.2d 37]), but upon the happening of that contingency (i.e., the death of her husband) she acquired a fundamental vested right in one pension or the other—according to whether or not that death was service-connected. It is the latter question which requires a judicial determination under the rule we announce today—a determination which, because the Board lacks the power to make it, must be made by the court through the exercise of its independent judgment on the evidence produced before the Board.[18]

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Wright, C. J., Tobriner, J., and Mosk, J., concurred.

**BURKE, J.**—I dissent. The majority hold that, as a matter of constitutional law, henceforth our trial courts must reweigh and independently adjudge decisions of local administrative agencies which touch upon "fundamental vested rights." The rationale employed to place this ruling upon a constitutional basis is that in *1950* the thousands of local boards in this state were deprived of the right to exercise quasi-judicial power. Given the critical importance of the majority's new rule and the vast changes it will cause in administrative review, the question immediately comes to mind: Why has it taken nearly 25 years to make this startling discovery? The question is, of course, rhetorical; the cases (including a unanimous 1964 decision by this court) have considered and uniformly rejected the majority's premise regarding the effect of the 1950 amendment to article VI of our state Constitution. Furthermore, if indeed local agencies may not exercise such quasi-judicial power, to weigh the evidence adduced at the hearings before them and to render binding decisions based thereon, in such widespread local activities as are conducted by such boards,[1] what

---

[18]We have indicated above (part I, *ante*) that the trial court, out of an abundance of caution, made a supplemental finding of fact to the effect that if this were a case in which it was authorized to exercise its independent judgment on the evidence it would find that the death of Mr. Strumsky was service-connected in nature. Because this finding will form the basis of the trial court decision upon remand, we deem it appropriate in the interest of judicial economy to observe, after a review of the record, that that finding is supported by substantial evidence. (See *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 143, fn. 10.)

[1]I.e., activities such as those entrusted to city councils, boards of trustees, school boards, boards of freeholders, charter revision commissions, zoning boards, planning

further principle excuses trial courts from independently adjudging the decisions of local agencies which do *not* affect fundamental vested rights, but at the same time constitute the exercise of quasi-judicial powers? The majority can not have it both ways; either local boards have quasi-judicial[2] power or they do not. If, as the majority insist, such power no longer exists, then necessarily *every* agency decision of which someone complains must be independently reviewed by the courts. The majority's premise, however, is patently, demonstrably incorrect, reversing an unbroken line of authority extending back more than 100 years.

In addition to other serious consequences which will follow today's decision, the majority has taken from the Legislature (in an ironic violation of the separation of powers doctrine) its constitutional authority to provide for local governmental bodies and invest them with appropriate powers. Unless and until a remedial constitutional amendment has been adopted to rewrite into the Constitution that which the majority decision here emasculates (authority for such local agencies to exercise quasi-judicial power), courts will be required, for the first time in the history of this state, to undertake the unnecessary and burdensome task of reweighing and redeciding (without deference to administrative expertise) every complained of decision of the thousands of local boards which affect "fundamental vested rights." Moreover, by improperly extending the scope of that term to include mere economic benefits, the majority vastly expand

---

commissions, variance boards, appeals boards under building codes, fire and police appeals boards, pension and retirement boards, civil service and merit systems boards and commissions, civic parade boards, business licensing boards, parks and playgrounds boards, recreation commissions, animal shelter boards, zoo boards, library boards and many others.

[2]Unlike the majority (*ante,* p. 42, fn. 14), I do not find the term "quasi-judicial" to be an inaccurate or unacceptable description of the administrative adjudicatory process, including fact-finding and decision-making functions. As stated by Justice Molinari in *Le Strange* v. *City of Berkeley,* 210 Cal.App.2d 313, 322-323 [26 Cal. Rptr. 550], "A municipality may lawfully confer quasi-judicial powers on boards or commissions dealing solely with municipal affairs. This power is acquired by municipalities under Article XI, section 8½, subdivision 4 of the Constitution. [Citation.] . . . [¶] The essential characteristic of the quasi-judicial body is its fact finding power and the concomitant requirement to make a determination or adjudication of fact in connection with matters properly submitted to it after a hearing. [Citations.]"

The foregoing power is termed "quasi-judicial" because it involves an adjudication of rights subject to judicial review under heretofore well-defined standards. In essence, we are faced herein with the question whether any provision of our Constitution forbids local boards the power to make fact findings which must be upheld by the courts if supported by substantial evidence and are not the result of arbitrary, capricious, or fraudulent action. Relief from the latter class of actions has always been available through appropriate court action.

the number of decisions subject to independent judgment review.[3] In view of the grave consequences of the majority's decision and the errors contained therein, I will review the opinion at some length.

1. *Constitutional sources of local agency powers*—The majority incorrectly assume that the source of the power of local boards to exercise quasi-judicial (fact-finding) functions derived *solely* from article VI, section 1, of our Constitution, which vests judicial power in the courts, and which formerly authorized the Legislature to establish "inferior courts" in towns, cities and counties. Of course, the majority's premise, weak as it seems, is that local administrative agencies were considered "inferior courts" by the framers of our Constitution. This premise was exploded over 100 years ago.

As early as 1868, this court correctly pointed out that it was unnecessary to resort to the "expediency" of holding that article VI, section 1, presents an exception to the separation of powers provision in article III. In *People* v. *Provines* (1868) 34 Cal. 520, the court explained that article III "means that the powers of the *State* Government, not the local governments thereafter to be created by the Legislature, shall be divided into three departments, and that the members of one department shall have no part or lot in the management of the affairs of either of the other departments . . . ." (P. 534, italics by the court.) With respect to local government, ". . . the Constitution does not, of itself—*ex proprio vigore*—create or establish any local or municipal governments; but, assuming that such governments will be required, provides that they, shall be created and established by the Legislature, and there drops the subject. . . . [Citing various provisions of article XI regarding the Legislature's power to establish local government bodies.] These provisions show very clearly that the creation and regulation of local and subordinate governments, such as county, city and town governments, is not attempted in the Constitution; and the whole subject of local and subordinate governments is, by that instrument, turned over to one branch of the Government, which it provides and defines, with certain admonitions only for its guidance." (Pp. 532-533.)

The court in *Provines* substantiated its analysis of the scope of article III by noting that "The mischief . . . against which they [the framers of

---

[3]See *Bixby* v. *Pierno,* 4 Cal.3d 130, 144-147 [93 Cal.Rptr. 234, 481 P.2d 242]. My views regarding the need for a uniform substantial evidence review of all administrative decisions are set forth in my dissent in that case (p. 151) and will not be repeated here.

the various state Constitutions] sought to provide, did not come from inferior or subordinate officers, but from the higher grades, in whose hands the first and leading powers of the Government were vested. So far as the former were concerned, they were sufficiently under the control of the latter. . . . Hence, the framers of American Constitutions were content with checks upon the latter, leaving the former, as we consider, to be regulated by the Legislative Department." (P. 537.)

Thus, *Provines* teaches us that the Constitution does not contain any limitation upon the powers of *local* government, other than as are contained in the Constitution itself or in statutes or charters adopted pursuant thereto. Accordingly, no constitutional prohibition prevents local boards from exercising quasi-judicial functions subject to ordinary substantial evidence review by the courts. The *Provines* rule has been consistently followed in subsequent cases. (See *Wulzen* v. *Board of Supervisors* (1894) 101 Cal. 15, 25-26 [35 P. 353]; *Holley* v. *County of Orange* (1895) 106 Cal. 420, 423-424 [39 P. 790]; *Dierssen* v. *Civil Service Commission* (1941) 43 Cal.App.2d 53, 59-61 [110 P.2d 513]; *County of Mariposa* v. *Merced Irr. Dist.* (1948) 32 Cal.2d 467, 476 [196 P.2d 920].) It is true that some cases have suggested that the "inferior courts" language in former article VI also furnished a basis for the exercise of judicial functions by local government. (See *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 81 [87 P.2d 848]; *Laisne* v. *Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 847 [123 P.2d 457].)[4] Yet no case has ever considered article VI to be the *sole* source of that authority; indeed, the cases have followed *Provines'* assertion in 1868 that article XI (the "home rule" provisions), in conjunction with article III (requiring a separation of the powers of *state* government), furnish additional, independent support.

Thus, in 1941 the Court of Appeal handed down its oft-cited opinion in *Dierssen* v. *Civil Service Commission, supra,* 43 Cal.App.2d 53, 59, an opinion authored by then Presiding Justice Raymond E. Peters. The court, flatly rejecting the argument now raised by the majority herein,

---

[4]One commentator criticized *Laisne's* reliance upon article VI in this respect, noting that previously ". . . the law of the State was long settled both as to statewide boards and local boards, and no one dreamed of calling local boards 'inferior courts.' Again, the truth is that these local agencies, like the statewide agencies, are created, not in exercise of power to create courts, but in exercise of the general legislative power to pass laws and provide agencies for their administration, agencies lying outside the judiciary. The limited degree of finality in deciding issues of fact which the legislature gives them is not exclusively a judicial function." (McGovney, *The California Chaos in Court Review of the Decisions of State Administrative Agencies,* 15 So.Cal.L.Rev. 391, 409-410; see *Dare* v. *Bd. of Medical Examiners,* 21 Cal.2d 790, 812-813 [136 P.2d 304] [conc. & dis. opn. by Traynor, J.].)

noted that "The question as to whether by charter provision local boards, such as a civil service commission, may be invested with judicial fact finding powers seems *never to have been seriously questioned in this state.* The books are full of cases expressly or impliedly holding that where fact finding powers have been conferred on local boards their determination will not be set aside unless an abuse of discretion is pleaded and proved, that is, unless it be alleged and proved that the board acted arbitrarily, capriciously or fraudulently. [Citations.]" (Italics added.) The court acknowledged that in such cases as *Standard Oil Co.* v. *State Board of Equal.* (1936) 6 Cal.2d 557 [59 P.2d 119], and *Drummey* v. *State Bd. of Funeral Directors, supra,* 13 Cal.2d 75, this court had imposed restrictions upon the exercise of judicial or quasi-judicial power by *state-wide* agencies, on the theory that article VI, section 1, vests the entire judicial power *of the state* in the courts. "All of those cases . . . expressly recognized that the holdings therein were applicable only to state-wide boards and did not apply to local boards." (*Dierssen, supra,* at pp. 59-60.) Justice Peters observed that local boards are governed by special constitutional provisions, such as "the broad provisions of article XI, section 6, of the Constitution dealing with the powers of chartered cities." (P. 60; accord: *Le Strange* v. *City of Berkeley, supra,* 210 Cal.App.2d 313, 322 [see fn. 2, *ante*].)

The "special constitutional provisions" relied upon by Justice Peters are now set forth throughout the various sections of article XI; these "home rule" provisions indicate quite clearly an intent to vest broad constitutional powers of self-government upon local governmental bodies. For example, section 7 contains language similar to that contained in former section 6, relied upon in *Dierssen;* that section provides that "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." With respect to county powers, the following additional provisions also confirm the conclusion that a county may be empowered (either by the Legislature or by charter) to perform quasi-judicial functions: (1) Section 1, subdivision (b), which provides that the Legislature shall provide for county powers; (2) section 4, subdivision (e), which provides that county charters shall provide for the powers and duties of governing bodies and county officers; (3) section 4, subdivision (f), which provides that county charters shall fix and regulate the powers, duties, qualification *and compensation* of county employees; (4) section 4, subdivision (h), which provides that charter counties shall have all powers that are provided by the Constitution or by statute for counties. In the instant case, the retirement board exercises quasi-judicial functions pursuant to statutory authority. (See Gov. Code, § 31534; *Flaherty* v. *Board of Retirement,* 198 Cal.App.2d 397, 407-408

[18 Cal.Rptr. 256].) As noted above, the Legislature derives its own authority to provide for county powers directly from the Constitution. (Art. XI, § 1, subd. (b).)

In sum, then, the majority err in assuming that local agencies lack a constitutional basis for the exercise of quasi-judicial functions.[5] Nothing contained in the Constitution limits local powers (as art. III pertains solely to *state* government, as the majority concede), and the home rule provisions of article XI vest broad power in local government (flowing from charter provision or legislative grant).

2. *The effect of the 1950 amendment to article VI*—The majority insist that *Dierssen* was incorrectly decided, and that the sole constitutional provision empowering local boards to exercise judicial functions was contained in the "inferior courts" language of former article VI, section 1, which language was deleted by a 1950 constitutional amendment. As I have explained, however, *Dierssen* simply continued the unbroken chain of cases which commenced in 1868 with *Provines* and which held that the state Constitution imposes no limitation upon the power of local government in dealing with municipal affairs.

Yet the conclusive refutation of the majority position is that the Court

[5]As I understand it, the majority's ruling is based primarily upon the premise that, in the absence of an *express* constitutional grant of power, local agencies may not exercise quasi-judicial functions. Yet as the *Provines* and *Dierssen* cases so clearly explain, such a grant of power is implicit in the home rule provisions of article XI and in the powers granted the Legislature to provide for local agencies of government contained in that article, and the limitation of article III to state government. The majority rely upon the remarks of a "leading commentator in the field of local government" to the effect that a municipality has no "inherent right of self government . . . ." (*ante,* p. 37, fn. 7.) Yet, as this same commentator explains in a subsequent chapter of his work, "In addition to powers conferred on municipal corporations by express enumeration in the constitution, statutes or charter, *it is beyond dispute* that municipal corporations possess certain implied, sometimes referred to as incidental, powers . . . ." (Italics added; 2 McQuillin, Municipal Corporations (1966 3d rev. ed.), § 10.12, pp. 765-766.) These implied powers include those powers necessarily or reasonably arising from those powers expressly granted, those powers essential to give effect to powers expressly granted, and those powers regarded as indispensable to local government to enable the municipality to fulfill the objects for which it was formed. (*Id.,* pp. 767-771.) The power to conduct fact-finding hearings and make decisions having at least a limited finality (being subject to ordinary substantial evidence review) seems clearly implicit in the constitutional grant of power under article XI. Under the majority view, such fact-finding hearings would serve little purpose, since the findings and conclusions which result therefrom must be ignored by the trial court in reweighing the evidence and redetermining the case in order to fulfill its newly imposed obligation to render an independent judgment review of the cold record before it.

of Appeal, and this court, long ago considered and rejected the argument that the 1950 amendment had any effect upon judicial review of local administrative decisions. First, in 1953, the court in *Savage* v. *Sox,* 118 Cal.App.2d 479, 485-488 [258 P.2d 80], was faced with the contention that, by reason of the 1950 deletion of language empowering the Legislature to create "inferior courts," local administrative bodies thereby lost their former authority to exercise quasi-judicial functions. Justice Bray, writing for a unanimous court, reviewed the *Provines* and *Dierssen* decisions discussed above and held as follows: "The quasi-judicial power of local boards and officers . . . has been upheld upon two theories: (1) that of cases like the *Dierssen* case, *supra,* 43 Cal.App.2d 53, applying the home rule provision of the Constitution, and (2) that of such cases as *Standard Oil Co.* v. *State Board of Equal., supra,* 6 Cal.2d 557, applying the former language of article VI, section 1, of the Constitution. The purpose of the 1950 amendment to that section as shown by the arguments to voters was to reduce the number of inferior courts in the state, not to interfere in anywise with the quasi-judicial powers of boards and officers who are not courts in the sense of that section. . . . The power exerted in this case [discharge from civil service] is a purely municipal affair and the voters in reducing the number of inferior courts never intended to, nor did they, in any way interfere with the rights granted municipalities, counties and cities and counties in the other portions of the Constitution. The elimination of the power of the Legislature to provide other inferior *courts* than the municipal and justice courts still left the constitutional provisions under which the charter of a city and county could lawfully confer quasi-judicial powers on boards or commissions dealing strictly with municipal affairs." (P. 488; italics by the court.)

Next, in 1964, this court expressly and unanimously approved *Savage* and its interpretation of the effect of the 1950 amendment. In *Berggren* v. *Moore,* 61 Cal.2d 347, 349 [38 Cal.Rptr. 722, 392 P.2d 522], plaintiff had contended that the trial court erred in refusing to exercise its independent judgment regarding the decision of a city council to adopt a redevelopment plan. We disagreed: "Plaintiffs' further suggestion that such holding [refusal to exercise independent judgment) contravenes the intent of the 1950 amendment of section 1 of article VI of the California Constitution is likewise without merit. (See *Savage* v. *Sox, [supra],* 118 Cal. App.2d 479, 485-488 . . . .)"

One would have assumed that our decision in *Berggren* settled the matter. Indeed, as recently as 1966, one textwriter commented that "Local agencies can exercise 'judicial' functions, simply because Cal. Const., art.

III, § 1, establishing the separation of powers, does not apply below the state level." (Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 1.3, p. 5, citing *People* v. *Provines, supra,* 34 Cal. 520.)

I fail to understand on what basis the majority now decided to abandon the reasoning of *Savage* and *Berggren* regarding the effect of the 1950 amendment. Certainly, no new information has come to light since 1964 regarding the intent of the framers of that amendment; my own research conclusively discloses that the amendment was not intended to effect any substantive change whatever in the functioning of local administrative decisions, or in judicial review of the decisions of those agencies. (See Judicial Council of Cal., 12th Biennial Report (1948) pp. 13-20, 41; Judicial Council of Cal., 14th Biennial Report (1953) pp. 13-14). Since the authorities uniformly held, prior to 1950, that local boards properly exercised quasi-judicial functions, by reason of the homerule provisions of article XI and the narrow scope of article III, and since it is clear that the 1950 amendment to article VI was not intended to effect a change in the law applicable to local boards, how can this court in 1974 (following contrary decisions in 1953 and 1964) seriously suggest that the 1950 amendment caused radical and revolutionary changes in administrative law? Under the majority's analysis, for nearly 25 years local boards have been exercising powers that they no longer possess; likewise, the trial courts have, for that period, improperly failed to undertake their constitutional responsibility to exercise independent review. In my view, this analysis is absurd.

The majority's decision has the additional unfortunate effect of placing the important question of the scope of review of local agencies beyond the control of the Legislature. In so doing, the majority overrule, either expressly or *sub silentio,* the *Provines-Dierssen* line of cases (holding that local agencies derive their powers from home rule provisions or from the Legislature, and not from art. VI), and the *Savage* and *Berggren* cases (regarding the effect of the 1950 amendment). In addition, the majority overrule a dozen or more cases *of this court* holding that the substantial evidence test controls in all cases involving local agency review[6] and scores

---

[6]See, e.g., *Berggren* v. *Moore, supra,* 61 Cal.2d 347, 349; *In re Redevelopment Plan for Bunker Hill,* 61 Cal.2d 21, 39 [37 Cal.Rptr. 74, 389 P.2d 538]; *Albonico* v. *Madera Irr. Dist.,* 53 Cal.2d 735, 739 [3 Cal.Rptr. 343, 350 P.2d 95]; *Damiani* v. *Albert,* 48 Cal.2d 15, 17 [306 P.2d 780]; *Atchison etc. Ry. Co.* v. *Kings Co. Water Dist.,* 47 Cal.2d 140, 143 [302 P.2d 1]; *Thompson* v. *City of Long Beach,* 41 Cal.2d 235, 239-240 [259 P.2d 649]; *Fascination, Inc.* v. *Hoover,* 39 Cal.2d 260, 264-266 [246 P.2d 656]; *Covert* v. *State Board of Equalization,* 29 Cal.2d 125, 131 [173 P.2d

of other cases holding that the decisions of local retirement boards such as respondent board herein are subject to a substantial evidence review.[7] Finally, the majority have acted in apparent realization that their interpretation of the constitutional provisions at issue faces a broad front of "contrary opinion" by legal scholars.[8] The majority pass over these contrary opinions with the comment that, to the extent these scholars express a contrary opinion, "we disagree with them." (*ante,* p. 36, fn. 6.) Such disagreement by fiat is the prerogative of the majority, but one might have hoped for a more persuasive insight into the problem.

---

545]; *La Prade* v. *Department of Water & Power,* 27 Cal.2d 47, 53 [162 P.2d 13]; *Walker* v. *City of San Gabriel,* 20 Cal.2d 879, 884 [129 P.2d 349, 142 A.L.R. 1383] [conc. opn. by Traynor, J.]; *Laisne* v. *Cal. St. Bd. of Optometry, supra,* 19 Cal.2d 831, 847; *Imperial Water Co.* v. *Supervisors,* 162 Cal. 14 [120 P. 780]; see Code Civ. Proc., § 1094.5, subd. (c); Cal. Administrative Mandamus, *supra,* § 5.65, p. 75.

[7]See, e.g., *Petry* v. *Board of Retirement,* 273 Cal.App.2d 124, 127 [77 Cal.Rptr. 891]; *Rau* v. *Sacramento County Ret. Bd.,* 247 Cal.App.2d 234, 236 [55 Cal.Rptr. 296]; *Flaherty* v. *Board of Retirement, supra,* 198 Cal.App.2d 397, 408 [18 Cal.Rptr. 256]; *Robinson* v. *Board of Retirement,* 140 Cal.App.2d 115, 117 [294 P.2d 724]; *Corcoran* v. *S. F. etc. Retirement System,* 114 Cal.App.2d 738, 740 [251 P.2d 59]; *Rogers* v. *Retirement Board,* 109 Cal.App.2d 751, 757 [241 P.2d 611]; *Odden* v. *County Foresters etc. Board,* 108 Cal.App.2d 48, 49 [238 P.2d 23]; *Dornell* v. *Retirement Board,* 72 Cal.App.2d 197, 198-199 [164 P.2d 266]; *Ware* v. *Retirement Board,* 65 Cal.App.2d 781, 788 [151 P.2d 549]; *Murphy* v. *Retirement Board,* 49 Cal.App.2d 58, 60-61 [121 P.2d 101]; *Naughton* v. *Retirement Board of S. F.,* 43 Cal.App.2d 254, 262-263 [110 P.2d 714] [conc. opn. by Peters, P. J.].

[8]See generally, California Administrative Mandamus, *supra,* section 1.3, page 5; Kleps, *Certiorarified Mandamus: Court Review of California Administrative Decisions 1939-1949,* 2 Stan.L.Rev. 285, 291-292; Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions 1949-1959,* 12 Stan.L.Rev. 554, 560-562; McGovney, *The California Chaos in Court Review of the Decisions of State Administrative Agencies,* 15 So.Cal.L.Rev. 391, 409-410; Peters, *Review of Administrative Board Rulings Limited to Writ of Mandate,* 14 State Bar J. 313; Elliott, *Certiorari and the Local Board,* 29 Cal.L.Rev. 586; Comment, *Scope of Judicial Review of Local Administrative Agencies in California,* 29 So.Cal.L.Rev. 332.

For example, Ralph Kleps in commenting upon the effect of the 1950 amendment stated that "No one would suggest at this late date [1960] that the disappearance of this major prop for the *Standard Oil Co.* decision will seriously modify the established doctrines in this field, but a district court of appeal has found itself compelled [in *Savage* v. *Sox*] to re-examine the theoretical basis upon which the normal quasi-judicial powers of local administrative agencies rest. The district court of appeal conceded that local agencies could no longer be regarded as inferior courts. The opinion concluded, however, that the separation of powers clause is limited in application to state agencies, and that local agencies are made predominant in respect to municipal affairs by the home rule charter provisions of article XI of the constitution. Under this analysis, the court found no difficulty in sustaining the exercise of normal quasi-judicial powers by local agencies created by chartered cities or counties." (Kleps, *supra,* 12 Stan.L.Rev. at p. 561.)

3. *Fundamental Vested Rights*—Finally, I strongly oppose the majority's ruling that the instant case involves a "fundamental vested right"; this case concerns nothing more than a choice between two types of survivor retirement benefits. Plaintiff clearly will receive a benefit of some kind, albeit the benefits differ in amount; a mere quantitative difference in the amount at issue should not be considered to involve a *fundamental* right. Otherwise, literally thousands of routine agency decisions adjusting or decreasing economic benefits will henceforth be considered "fundamental," requiring our busy trial courts to independently evaluate and reweigh all factual aspects of these often complex and technical proceedings. (For example, many cases, such as the instant case, will present complicated medical questions best resolved by the local agency equipped to do so, rather than by a trial court working only with the cold administrative record before it.)

Although the cases refer to retirement benefits as being "vested" in the member and his beneficiaries, no vested right to a benefit *in a specific amount* arises until the happening of the contingency upon which the benefit is payable. (See *Packer* v. *Board of Retirement,* 35 Cal.2d 212, 215-218 [217 P.2d 660]; *Kern* v. *City of Long Beach,* 29 Cal.2d 848, 855 [179 P.2d 799]; *Casserly* v. *City of Oakland,* 6 Cal.2d 64, 66-69 [56 P.2d 237].) The case most analogous is *Bertch* v. *Social Welfare Dept.,* 45 Cal.2d 524, 529 [289 P.2d 485], wherein this court held that an applicant for old age benefits is not entitled to an independent judgment review of an adverse administrative decision: "Petitioners here were not possessed of a vested right, but the right to make application for old age benefits provided that they were able to comply with the statutory prerequisites therefor (Welf. & Inst. Code, § 2160 et seq.)." (See also *Taylor* v. *Martin,* 28 Cal.App.3d 1057 [105 Cal.Rptr. 211] [welfare benefits].) In the instant case, the right to a service-connected death benefit was similarly contingent upon compliance with statutory prerequisites, including proof of a service-connected death.

For the reasons set forth above, I respectfully dissent to the majority opinion.

McComb, J., and Roth, J.,* concurred.

**ROTH, J.***—The dissent of my Brother Burke, with which I concur in all respects, requires no amplification. I trust there is no impropriety in a reiteration of some of its statements and an emphasis of its implications.

---

*Assigned by the Chairman of the Judicial Council.

The principle of separation of powers upon which the majority predicate their opinion is, of course, an integral part of our constitutional structure—but the keystone of that structure is the proposition that all power flows from the People. Before and certainly after *Dierssen* (1941), as pointed out by Burke, J., the bench and bar were convinced that the Constitution had been adequately amended by the People to endow a "local agency" to make binding findings of fact when such findings are based upon substantial evidence.

The new construction announced by the majority does not remotely suggest any lack of due process requirements in the amendment construed and *sub silentio* concedes that due process has been complied with in the hearings conducted by a "local agency," within the meaning of current cases such as *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]; *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011]; *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13]; and *Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979]. The reconstruction of the constitutional amendment announces to both bench and bar that over the years each has erroneously assumed that the amendment was broad enough in scope to endow a "local agency" to make findings of fact in those cases which affected fundamental vested rights. The new construction announces that a trial judge, by way of mandate review, who has neither seen nor heard the witnesses may: albeit he has only a paper record, decide which of the witnesses are entitled to full or something less than full credit; make an independent analysis of the evidence; ignore, modify or reverse the findings of the "local agency" even though supported by substantial evidence; and pronounce a judgment modifying or reversing the judgment of the "local agency." The majority construction sets up a system of review comparable to that which now enables any federal district judge to nullify the final decision of any state court in a criminal case when a question of constitutional right is presented. (*Townsend* v. *Sain* (1963) 372 U.S. 293 [9 L.Ed.2d 770, 83 S.Ct. 745].)[1]

---

[1]The trial judge in setting aside the agency's finding in the mandate proceeding need write no opinion. However, a trial judge in the usual case over which he presides may not set aside a judgment in a jury or nonjury case and grant a new trial unless he does with detail and specificity list his reasons for doing so. (Code Civ. Proc., § 657; *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359 [90 Cal.Rptr. 592, 475 P.2d 864].) If a trial judge presiding in a mandate review permits additional evidence, no matter how meager—the findings of the trial judge would be binding upon the appellate courts. It may be that if in the mandate hearing no additional evidence is taken, that an appellate court may also review the record independently and arrive

The difficulty of determining the sweep of fundamental and vested rights (*Bixby* v. *Pierno,* 4 Cal.3d 130, 139, 145 [93 Cal.Rptr. 234, 481 P.2d 242]) and the scope of what binding fact power has been abandoned by the majority to the "administrative expertise" of a "local agency" is graphically illustrated in the case at bench. (See discussion, Burke dissent, *ante,* p. 46, and *Bixby* v. *Pierno, supra.*)

*Pierno* enunciates an ambiguous definition of fundamental rights[2] which concedes such rights must be determined on an ad hoc basis but to illustrate the difference between fundamental and other right, the definition points to the case-hardened distinction that an application for a job is not a fundamental right but a dismissal from a job is. However, in a separate concurring opinion, Mosk, J., registers a caveat to the illustration and says in no uncertain terms that, given stated conditions he does not intend to be bound by cases which hold that an application for a job is not a fundamental right.[3]

at a different conclusion, albeit in a written opinion. In brief, on fundamental vested rights, the "local agency" may reach one conclusion, if the trial court takes evidence on mandate review then under compulsion of settled law, appellate courts must accept the trial court's findings. However, if no evidence is taken in the trial court, there is no finality in the state courts until the Supreme Court has spoken. Since any adroit lawyer can transmute a fundamental vested right into a constitutional right, a litigant may always hopefully anticipate that a federal district court will "civilly writ" the state court. A fruitful and fertile field for such federal procedure may be found in 28 United States Code section 1343 (jurisdiction of federal courts) and 28 United States Code sections 1443 and 1446 (the removal sections).

[2]The embrace of fundamental vested rights is vague and illusive as set forth in *Bixby* v. *Pierno,* 4 Cal.3d 130 [93 Cal.Rptr. 234, 491 P.2d 242], wherein the court says at page 144: "The courts must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review. (*Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 915 [80 Cal.Rptr. 89, 458 P.2d 33]; *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court* (1968) 259 Cal.App.2d 306, 316 [66 Cal.Rptr. 183].) As we shall explain, the courts in this case-by-case analysis consider the nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, and, if it is such a fundamental right, whether it is possessed by, and vested in, the individual or *merely sought by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency.* If, however, the right has been acquired by the individual, and if the right is fundamental, the courts have held the loss of it is sufficiently vital to the individual to compel a full and independent review. The abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction." (Italics added.)

[3]Mosk, J., in a concurring opinion states: (p. 161) "There is only one qualification attached to my approval. I would find it difficult, in an appropriate factual context,

One wonders what the result at bench would have been if the constitutional language, pursuant to which "local agencies" have acted for so many years, had specifically included language authorizing a "local agency" to make a binding determination of facts in respect of fundamental vested rights. Since what rights are and what rights are not fundamental and vested elude definition, can any amendment be framed which would withstand nullification if it deprives the judiciary of binding fact-finding power in any case. If the exercise by a "local agency" of binding fact-finding power is the exercise of a judicial function in respect of fundamental and vested rights—it is also the exercise of a judicial function in respect of such rights, if any, which may be tolerantly regarded as nonfundamental and not vested.

The current decision demonstrates that amendments to our fundamental law, even though originally ratified and accepted by the courts, may be reconstrued in such a manner as to effectually emasculate them.

The real question is not one of separation of powers but whether the People have, by the Constitution they originally wrote, effectively foreclosed themselves from making any change in their constitutional structure and have abdicated all power to the judiciary.

Respondent's petition for a rehearing was denied April 24, 1974, and the opinion was modified to read as printed above. Burke, J., and Clark, J., were of the opinion that the petition should be granted.

---

to recognize vested or fundamental rights—as those terms are used in the majority opinion—*in one who is licensed as a member of a profession* or state-regulated vocation *but not in another* who seeks a license to practice his calling, particularly if the latter is equally well qualified by virtue of his investment of time and treasure. . . ." (Italics added.)