Filed 3/4/15  Headley v. Bd. of LA City Employees Retire. Syst. Commissioners CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOHN HEADLEY, | B249107 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS136223) |
| v. | |
| BOARD OF LOS ANGELES CITY EMPLOYEES RETIREMENT SYSTEM COMMISSIONERS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles.  Luis A. Lavin, Judge.  Affirmed.

Law Offices of Jeffrey C. McIntyre and Jeffrey C. McIntyre for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Alan L. Manning, Assistant City Attorney, and James H. Napier, Deputy City Attorney, for Defendants and Respondents.

_____

**SUMMARY**

In December 2001, plaintiff John Headley resigned from his employment with the City of Los Angeles (City) as a part of the settlement of a disability discrimination lawsuit he had filed against the City in April of that year. Four years later, he applied to Los Angeles City Employees Retirement System (LACERS) for disability retirement benefits. More than five years after that, in May 2011, the Board of Administration of LACERS (Board) denied his application, finding he was capable of performing his duties as a planning assistant with accommodations; he voluntarily chose to resign from his employment; and he had no right to claim a disability retirement at the time of his resignation because his employer the Department of City Planning (Department), could have accommodated his work restrictions if he had not resigned.

After the Board denied plaintiff's motion for reconsideration, plaintiff sought a writ of mandate (Code Civ. Proc., § 1094.5) seeking to set aside the Board's decision. The trial court denied his petition. We affirm the judgment denying the writ of mandate.

**FACTS**

The City hired plaintiff in 1977 under a program for persons with disabilities. In 1980, plaintiff began working at the Department as a planning assistant. A short time later, plaintiff was diagnosed with neurovascular necritis of his left hip, and he was limited to sedentary work.

Over the years, plaintiff's doctors intermittently imposed various limitations such as reduced work schedules and flexible hours, and the Department accommodated those limitations as they were imposed. In 1995, a doctor restricted plaintiff from standing for more than 10 minutes at a time, and in 1995 and 1996, the Department provided a motorized chair with variable seat height and an ergonomic workstation to provide necessary height and mobility for plaintiff's legs, in accordance with medical prescriptions.

In early 1997, the Department asked plaintiff to work at the public counter in Van Nuys, an assignment that traditionally required standing at the counter to assist members of the public (but was considered "one of the most sedentary assignments at the

2

Department"). Plaintiff agreed, provided that he be given a stool so he could alternately sit or stand in conformity with his medical restrictions. The Department ordered the stool, but it did not arrive. In December 1997, plaintiff's union representative complained that plaintiff had been working for nearly a year without his medically prescribed stool. The Department immediately reordered it, and it finally arrived in March 1998, but it was too low for plaintiff to sit comfortably at the public counter while performing his work.

In May 1998, plaintiff "went off of work," asserting that the lack of appropriate accommodations had exacerbated his medical condition, and claiming both physical and psychological injuries as a result of the Department's failure to accommodate him.

Plaintiff's orthopedist, Phillip Sobol, determined plaintiff had permanent work restrictions that precluded him from returning to his job. Plaintiff began to collect disability insurance benefits under a private policy, but after a review the insurer discontinued the disability benefits. The private insurer determined that the medical evidence did not support Dr. Sobol's opinion and plaintiff was able to work at the public counter if he were accommodated appropriately, specifically, if his ergonomic workstation were transferred to the counter so he could sit and stand as needed. Plaintiff's managers agreed they could move the ergonomic workstation close to the public counter.

In November 1999, the private insurer discontinued payments to plaintiff.

In August 2000, Dr. Sobol tentatively cleared plaintiff for return to work, stating: "I continue to feel that the patient's workstation is in need of ergonomic evaluation by an independent specialist in this field. [¶] If the patient's desk could undergo such an evaluation and his duties could be modified to be consistent with the previously recommended work restrictions, then vocational rehabilitation would not be necessary."

In November 2000, Dr. Noel Lustig, a psychiatrist, cleared plaintiff to return to work, so long as he did not have to work under a particular high level manager. There was no issue concerning the Department's accommodation of this condition because the manager in question did not work at the Van Nuys location.

3

In December 2000, the Department's doctors cleared plaintiff to return to sedentary work with the same restrictions imposed by plaintiff's doctors, stating: "The patient can do work, predominantly in a sitting position at a bench, desk or other table with a minimum of demands for physical effort and with some degree of walking and standing being permitted. Please note that the patient's workstation is in need of ergonomic evaluation by an independent specialist."

In January 2001, a meeting took place attended by, among others, plaintiff, his counsel, and Jo Ann Anderson, a personnel officer with the Department. At that meeting, Ms. Anderson stated that plaintiff "could not be accommodated with his restrictions at [this] point in time." This was because of her understanding that "new restrictions" not previously in place ("limitations on his hands, wrists, arms, and so forth") had been placed on plaintiff, and she "felt that he could no longer perform the essential duties and responsibilities of the planning assistant position." Ms. Anderson later testified that she is the one who would have made "the determination whether or not [plaintiff] could be accommodated," "[b]ased on the review of the limitations and past experience and requirements of the job . . . ." She remembered consulting with an attorney in the personnel department, and based on those communications, "the final analysis was at that particular time . . . that it would be difficult for [plaintiff], if not impossible for him, to actually perform those duties and responsibilities."

In April 2001, plaintiff filed a lawsuit against the City, alleging he sought and was denied reasonable accommodations of his physical disability and medical condition, including but not limited to "assigning plaintiff to positions where he could comfortably sit and work, which positions were available, providing plaintiff with a proper chair and/or lowering the public counter at which plaintiff worked."

Marie McTeague, an employment litigator for the City Attorney's office, handled the defense and resolution of plaintiff's claim. The City Attorney's office concluded, and advised the Department, that "it had clearly failed to accommodate [plaintiff]" during the period 1997 through mid-1998, and "there was definitely exposure for the failure to accommodate during the one and-a-half year period." According to Ms. McTeague, once

4

these facts were brought to the Department's attention, "it was very willing to go ahead and make the appropriate accommodations for [plaintiff]." And one of Ms. McTeague's duties, when she was assigned to the case, "was to try to advance the accomplishment of those accommodations." To that end, she "scheduled a meeting with [plaintiff] and his attorney to discuss implementation of the accommodations at the Van Nuys office," and retained an expert "to conduct a reasonable accommodation analysis of [plaintiff's] ergonomic workstation as Dr. Sobol had advised. [¶] The expert ultimately recommended additional furniture that she thought would better suit [plaintiff's] needs."

In September 2001, plaintiff took the deposition of Ms. Anderson, who testified as described above about the January 2001 meeting. She acknowledged that plaintiff "had never been accommodated properly during his entire tenure at the Van Nuys office . . . ." Ms. Anderson also expressed her view that other persons should have been responsible for deciding whether or not plaintiff could be accommodated, and testified it was "fair to say" that she did not know "whether, in fact, [plaintiff] could do the job or not do the job with accommodations." Angela Kirkwood, a senior personnel analyst with the Department, also gave deposition testimony, in August 2001, that her understanding was that "if [plaintiff] wanted to come back to work today he couldn't do it because . . . the City of Los Angeles has not yet accommodated him."

In October 2001, the parties participated in a mediation. At that time, Ms. McTeague "confirmed with the department that . . . new furniture was being recommended by the ergonomic work specialist, and the department stood ready, willing and able to purchase that furniture as an accommodation and hoping to resolve the lawsuit by appropriately accommodating him and compensating him for the 18-month period where he was not adequately accommodated."

In November 2001, the parties agreed to settle the lawsuit, and the settlement was approved on December 18, 2001. The City paid $375,000 and plaintiff agreed to resign from his employment with the City.

On December 15, 2005, plaintiff filed his disability retirement application. (Under current rules, such an application must be filed within one year of discontinuance of

5

service (see Los Angeles Administrative Code, § 4.1008(a)), but the period is equitably tolled during the pendency of workers compensation proceedings. (*Collier v. City of Pasadena* (1983) 142 Cal.App.3d 917, 919.)) The parties agree that if the application had been approved, the effective date of plaintiff's retirement would have been September 2, 1998 (the day after his "last day on active payroll").

Both before and after plaintiff's application, numerous doctors examined him, either to determine if he was disabled from working at the Department or entitled to benefits under workers compensation laws. All prepared reports. These included a September 2004 report from Dr. Alexander Angerman, the agreed medical examiner in plaintiff's workers compensation case; reports from six other doctors in several fields (orthopedics, neurology, psychiatry and internal medicine); and a supplemental report in April 2008 from plaintiff's physician, Dr. Sobol. All these reports were submitted to the Board. The doctors arrived at various, different conclusions. In summary:

In September 2004, Dr. Angerman concluded plaintiff was "not orthopaedically capable of performing the job activities as described and would be considered a Qualified Injured Worker who is eligible for vocational rehabilitation benefits."[1] Dr. Angerman observed, however, that he had "not been given the benefit of reviewing any medical records prior to the date the patient stopped working for the City," and had not been provided with a formal job analysis. He relied on plaintiff's description of his job activities: "occasional standing and walking with occasional bending, stooping and twisting his body"; no kneeling, squatting and crouching; rare stair climbing; frequent sitting; no lifting or carrying; no overhead reaching; no heavy physical labor; no heavy pushing and pulling; and frequent typing and computer work. Dr. Angerman "felt [plaintiff's] condition reached a permanent and stationary status no more than six months after he stopped working in May of 1998." Dr. Angerman stated plaintiff required

---

[1] Cf. *English v. Board of Administration* (1983) 148 Cal.App.3d 839, 844 ("an admission that an employee's disability meets the rehabilitation standard is . . . not legally equivalent to an admission that the disability meets the City's pension standard"; the former standard is "much more lenient" than the latter).

prophylactic work restrictions precluding him "from performing very heavy work and repetitive or prolonged motions of the cervical spine"; from "performing prolonged or forceful gripping, grasping and squeezing activities, as well as very prolonged fine manipulation activities"; from "performing heavy lifting and repetitive or prolonged bending and stooping activities"; and "limiting him to semi-sedentary work activities."

In March 2006, Dr. J. Randall Davis, an orthopedic surgeon, concluded that, from an orthopedic standpoint, plaintiff was not considered disabled from performing his described duties as a planning assistant. Dr. Davis reiterated this conclusion in March 2007, after reviewing additional records including Dr. Angerman's September 2004 report.

In April 2006 and again in February 2007, Dr. Igor Shnayder, a psychiatrist, concluded that plaintiff was not considered disabled from a psychiatric standpoint, and could perform the duties described in the documents provided to Dr. Shnayder.

In April 2006, Dr. Anitha Michell concluded plaintiff was "able to perform the duties of his job, as described, from an internal medicine perspective."

In September 2006 (and again, after reviewing additional medical records, in March 2007), Dr. Ronald Farran, a neurologist, concluded that "in view of [plaintiff's] subjective complaints in his hand, neck and back, he is considered disabled from returning to his described duties of Planning Assistant." Dr. Farran further stated that if plaintiff were allowed to return to work, "accommodations will be necessary to allow him to sit at an ergonomically proper height workstation, and standing will need to be limited to as tolerated, with standing no more than 20 minutes at a time per hour, at which time he should be allowed to sit for the remainder of that hour."

In August 2007, Dr. Robert Freundlich, a neurologist, concluded that, on a neurological basis, plaintiff was able to perform the duties of a planning assistant, and "[n]o accommodations are required on a neurological basis."

In February 2008, Dr. Ronnie Karayan, a neurologist, concluded: "I do not feel the patient is able to perform the duties as described," and plaintiff "has an inability to perform duties that require prolonged sitting or standing." (The duty description

Dr. Karayan relied on included "the need to walk up to 3 hours a day as well as to sit for approximately 3 to 6 hours daily in addition to frequent lifting and carrying of light objects . . . .") Dr. Karayan further stated that "[a]ny return to work would need to be accompanied by accommodations which might include limiting sitting and standing to no more than 30 minutes at a time, with flexibility to stand and sit at his convenience. In addition, an ergonomically suitable work environment would be mandatory."

In an April 2008 supplemental report, Dr. Sobol disagreed with the opinion of Dr. Davis, saying he "continue[d] to feel that [plaintiff] is physically incapable of returning to work at his usual and customary job duties as an urban planner, primarily due to the weight-bearing requirements and prolonged posturing of the head and neck, frequent bending and squatting, and repetitive fine manipulation and movements required with the right major upper extremity, as well as the fact that [plaintiff] worked at a very ergonomically unsound workstation."

In June 2009, Dr. Davis examined plaintiff again and concluded, "I would say [plaintiff] could return to this job as long as he can be provided with a chair that allows him to sit in a slightly elevated position to relax the hips. I believe he could sit in a regular chair for up to 20 minutes at a time but then he should be allowed to again sit on an elevated seat. If such a chair is not possible, he should be able to alternate between sitting and standing so that he is not required to either sit or stand for more than about 20 minutes at a time."

The Board held an administrative hearing on May 10, 2011, and denied plaintiff's claim. Its findings of fact were that plaintiff "is . . . capable of performing the duties of a Planning Assistant, with accommodations"; the Department "had obtained the appropriate accommodation for his work restrictions at or near the time he stopped reporting to work"; he "voluntarily chose to resign from his employment in settlement of a lawsuit wherein he alleged that the employer had 'failed to accommodate' his work restrictions"; the Department "could have accommodated his medical restrictions had he not resigned his position in 2001"; and he "did not have a matured right to claim a

8

disability retirement at the time of his resignation because the Department could have accommodated his work restrictions."

The Board denied plaintiff's request for reconsideration, and plaintiff filed a petition for a writ of mandate ordering the Board to set aside its decision. After a hearing, the trial court issued a detailed order denying the petition.

Among the trial court's conclusions were that the "vast majority" of the medical professionals concluded plaintiff was not disabled "and/or could perform the duties of a Planning Assistant with accommodations"; Dr. Angerman's medical opinion was flawed and "not entitled to very much weight" because of discrepancies in plaintiff's description of his job duties and the lack of review of plaintiff's medical records before he stopped working; the opinions of Drs. Farran and Karayan were entitled to limited weight, as they were based on incorrect job duties (the need to walk up to three hours a day), and in any event still found plaintiff could have returned to work if properly accommodated; and the weight of the evidence prior to plaintiff's resignation in 2001 (the medical opinions in 2000) showed plaintiff could have returned to work with accommodations.

Further, the trial court found Ms. Anderson's deposition testimony was "of limited evidentiary value" on the issue whether plaintiff was capable of performing his duties with accommodations, because she was not a medical professional and she conceded she did not know whether or not plaintiff could be accommodated. The court concluded the Board's finding that plaintiff voluntarily chose to resign in settlement of a lawsuit claiming the employer "failed to accommodate" his work restrictions was "not reasonably in dispute," and the record "establish[ed] that the City would have paid [plaintiff] less than the $375,000 he received in the settlement agreement if he had agreed to return to work with additional accommodations." In addition, there was "[e]xtensive testimony" at the administrative hearing "that the Department was ready and willing to make the appropriate accommodations for [plaintiff]."

Judgment was entered and this appeal followed.

## DISCUSSION

If, as here, the decision of an agency substantially affects a fundamental vested right, "the trial court, in determining under [Code of Civil Procedure] section 1094.5 whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence." (*Strumsky v. San Diego Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32.) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.)

On appellate review, we do not reweigh the evidence, and determine only whether substantial evidence supports the trial court's findings. (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 436.) As one court has put it, "[t]he question on appeal is whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the [agency's] findings of fact." (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1078.)

Here, the trial court duly conducted an independent review of the record, and concluded that the weight of the evidence supported each of the Board's fact findings. Our review of the record – recited above in detail – discloses no basis for reversing the trial court's findings, as they are plainly supported by substantial evidence.

Plaintiff insists there is no substantial evidence for any of the trial court's determinations. To reach this conclusion, plaintiff in effect tells us to ignore the reports of all the doctors except Dr. Sobol (his physician) and Dr. Angerman (the workers compensation physician), because all the other doctors were "writing in the present tense, as of the time of their reports from 2006 to 2009," and "[n]one offered any opinion as to the status of [plaintiff], or the work, as it existed in 2001." Plaintiff further claims that

10

the trial court determined that "the medical evidence required had to be related to 2001," and "the best evidence" that he was incapable of performing his duties was the testimony of Jo Ann Anderson. Plaintiff's contentions are misconceived.

First, the trial court did not find, as plaintiff claims, that only medical evidence concerning plaintiff's condition in 2001 was relevant. On the contrary, in finding the weight of the evidence supported the Board's finding that plaintiff was capable of performing his duties with accommodations, the trial court specifically described, considered and weighed *all* the medical evidence before the Board. At the hearing, the court focused, appropriately, on plaintiff's condition in 2001, and pointed out that plaintiff had the burden of proof. The court asked: "[W]here exactly does one of your doctors opine that as of December 2001, which is the time period we're talking about, not 2004, not 1998, not 2013, that your client cannot perform the functions of the job as of that specific date?" And, "again, this is a problem that I have with your burden of proof. As of 2001 or 2004 when [Dr. Angerman's] report was done?" And, "[m]aybe I'm not being clear. A lot of things happen to people over a period of time. For all I know, your client could have been in a car accident, could have sprained his leg, could have fallen down somewhere between the time that he left employment with the City and the time that the opinion was rendered by the doctor. [¶] You're the petitioner. So you have the burden of proof." Nothing in these comments suggests that any of the medical evidence was irrelevant; we understand the court's comments to mean that plaintiff did not convince the court (as was his burden) that the Board's finding was contrary to the weight of the evidence.

Second, the (appropriate) focus on plaintiff's condition when he resigned in 2001 does not render irrelevant medical evidence prepared at later dates, or evidence of plaintiff's condition at later dates. Moreover, by way of example, Dr. Davis reiterated his opinion that plaintiff was not considered disabled from performing his duties after reviewing additional records that included Dr. Angerman's 2004 report upon which plaintiff so heavily relies.

11

Third, there were medical opinions issued in August, November and December 2000, described above, indicating plaintiff could return to work with proper accommodations. Plaintiff's claim there was "absolutely no medical evidence . . . that indicated that as of 2001, [plaintiff] could perform his job with accommodations" is simply wrong. One can certainly infer, from evidence to that effect before and after 2001, that plaintiff could have performed his duties with accommodations in 2001.

Fourth, the trial court disagreed with plaintiff's claim that Ms. Anderson's September 2001 testimony was the "best evidence" that he could not perform his duties, finding her testimony "of limited evidentiary value." It is not our role to weigh the evidence, and in any event the record offers no basis for disagreement with the court's assessment. We note as well that plaintiff's reliance on Ms. Anderson's testimony to show that his resignation was not voluntary – because, "based on Ms. Anderson's September 25, 2001 deposition, he was never going to be employed by the City again" – is likewise misplaced.

Ms. Anderson's testimony referred to events in January 2001, before plaintiff filed his lawsuit alleging the City's failure to accommodate his disabilities. The evidence is clear that after plaintiff filed the lawsuit, the City Attorney's office advised the Department that it had improperly failed to accommodate plaintiff from 1997 until he stopped working in May 1998, and the Department was "very willing to go ahead and make the appropriate accommodations for [plaintiff]." Ms. McTeague was charged with "try[ing] to advance the accomplishment of those accommodations," and, among other things, she scheduled a meeting with plaintiff and his attorney "to discuss implementation of the accommodations at the Van Nuys office." This evidence belies plaintiff's claim his resignation was not voluntary.

We note one other point, in connection with plaintiff's contention that no evidence supported the Board's finding that "[plaintiff's] employing department had obtained the appropriate accommodations for his work restrictions at or near the time he stopped reporting to work." The trial court stated "this is a closer call," but concluded the evidence "still supports the Board's finding." The court cited evidence of various

12

accommodations the Department made for plaintiff before he stopped working in May 1998, including the ergonomic work station in May 1996; the stool that finally arrived in March 1998 (although plaintiff found it was too low to sit comfortably); and, after plaintiff's disability insurer opined plaintiff could work at the public counter if his ergonomic work station were transferred there, plaintiff's managers agreed they could do so (apparently sometime in late 1999). The court also cited the City Attorney's retention of an ergonomic expert to analyze the furniture, but this was sometime after suit was filed in April 2001.

It does not appear to us that there is any evidence the accommodations the trial court cites were obtained "at or near the time he stopped reporting to work" in May 1998. Indeed, the City admits its failure to accommodate plaintiff from 1997 through mid-1998. But this does not change the propriety of the Board's denial of plaintiff's disability retirement application or the trial court's refusal to set aside the Board's decision. The evidence amply supported the trial court's conclusions that the weight of the evidence showed plaintiff was capable of performing his duties with accommodations when he resigned; he voluntarily chose to resign in settlement of the lawsuit alleging failure to accommodate his work restrictions; and the Department could have accommodated those restrictions had he not resigned. And there is no evidence the Department would not have accommodated him in December 2001 had he chosen not to resign; the only evidence is to the contrary. In short, regardless of whether the Department had obtained the appropriate accommodations for him "at or near" May 1998, substantial evidence supports the conclusion he had no matured right to a disability retirement when he resigned in December 2001.

## DISPOSITION

The judgment is affirmed. No costs are awarded.


GRIMES, J.

We concur:

RUBIN, Acting P. J.                    FLIER, J.

13